# 14-1658-cv

IN THE

# United States Court of Appeals

## FOR THE SECOND CIRCUIT

IKB INTERNATIONAL S.A. IN LIQUIDATION, IKB DEUTSCHE
INDUSTRIEBANK AG,

*Plaintiffs-Appellants,*

—against—

BANK OF AMERICA CORPORATION, BANK OF AMERICA N.A., MERRILL LYNCH,
PIERCE, FENNER & SMITH, INCORPORATED, f/k/a BANC OF AMERICA
SECURITIES LLC, MERRILL LYNCH & CO, INC., MERRILL LYNCH MORTGAGE
CAPITAL, INC., ASSET BACKED FUNDING CORPORATION,

*Defendants-Appellees,*

CREDITBASED ASSET SERVICING AND SECURITIZATION LLC,

*Defendant.*

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

## BRIEF FOR PLAINTIFFS-APPELLANTS

JOEL H. BERNSTEIN
MARK S. ARISOHN
BARRY M. OKUN
LABATON SUCHAROW LLP
140 Broadway
New York, New York 10005
(212) 907-0700

*Attorneys for Plaintiffs-Appellants*

# STATEMENT PURSUANT TO FED. R. APP. P. 26.1

## Plaintiff IKB Deutsche Industriebank AG ("IKB AG")

LSF6 Europe Financial Holdings L.P. is the parent of IKB AG.  LSF6 Europe
Financial Holdings L.P. is not a publicly held corporation.   IKB AG is not aware
of any publicly held corporation that holds 10% or more of its stock.

## Plaintiff IKB International S.A. in Liquidation ("IKB SA")

IKB AG is the parent of IKB SA.  IKB AG is a publicly held corporation.  Other
than IKB AG, IKB SA is not aware of any publicly held corporation that holds
10% or more of its stock.

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................. iii

JURISDICTIONAL STATEMENT .......................................................1

STATEMENT OF THE ISSUES............................................................1

STATEMENT OF THE CASE................................................................3

A.    Parties.........................................................................................5

B.    Statement of Facts.....................................................................6

C.    The Decisions Below ...............................................................11

SUMMARY OF THE ARGUMENT ....................................................11

      Abandonment of Underwriting Guidelines ..............................12

      LTV/CLTV .................................................................................13

      Owner-Occupancy Rates ..........................................................14

      "Mortgage-Backed" Securities ................................................14

      Reliance .....................................................................................15

ARGUMENT ........................................................................................15

POINT I
      PLAINTIFFS ADEQUATELY PLED A FRAUD CLAIM .........16

      A.    Abandonment of Underwriting Guidelines........................17

            1.    Falsity....................................................................17

            2.    Scienter..................................................................24

      B.    LTV/CLTV Ratios ...............................................................31

            1.    Falsity....................................................................31

            2.    Scienter..................................................................32

C.    Owner-Occupancy Rates ....................................................36

      1.    Falsity ........................................................36

      2.    Scienter ......................................................36

D.    "Mortgage-Backed" Securities .......................................38

      1.    Falsity ........................................................38

      2.    Scienter ......................................................43

E.    Scienter Generally .......................................................44

F.    Reasonable Reliance ....................................................46

POINT II
    PLAINTIFFS ADEQUATELY PLED NEGLIGENT
    MISREPRESENTATION AND FRAUDULENT CONCEALMENT
    CLAIMS ...........................................................................49

POINT III
    PLAINTIFFS ADEQUATELY PLED AN AIDING AND
    ABETTING CLAIM ..........................................................50

CONCLUSION ......................................................................52

## TABLE OF AUTHORITIES

### Cases

*5-Star Management, Inc. v. Rogers*,
  940 F. Supp. 512 (E.D.N.Y. 1996) ....................................................39

*Abu Dhabi Commercial Bank v. Morgan Stanley & Co.,*
  888 F. Supp. 2d 431 (S.D.N.Y 2012),
  *on reconsideration in part,*
  888 F. Supp. 2d 478 (S.D.N.Y. 2012) ........................................47, 48

*Abu Dhabi Commercial Bank v. Morgan Stanley & Co.*,
  910 F. Supp. 2d 543 (S.D.N.Y. 2012) ............................................50

*In re Adler, Coleman Clearing Corp.*,
  247 B.R. 51 (Bankr. S.D.N.Y. 1999),
  *aff'd* 263 B.R. 406 (Bankr. S.D.N.Y. 2001) ....................................47

*Allstate Insurance Co. v. Ace Securities Corp*,
  No. 650431/2011, 2013 WL 1103159
  (Sup. Ct. N.Y. Cnty. Mar. 14, 2013) ................................................48

*Allstate Insurance Co. v. Countrywide Financial Corp.*,
  824 F. Supp. 2d 1164 (C.D. Cal. 2011) .......................................*passim*

*Allstate Insurance Co.*
  *v. Credit Suisse Securities (USA) LLC*,
  986 N.Y.S.2d 864, 2014 WL 432458
  (Sup. Ct. N.Y. Cnty. 2014) ........................................................*passim*

*Allstate Insurance Co. v. Merrill Lynch & Co.*,
  No. 650559/2011, 2013 WL 4046711
  (Sup. Ct. N.Y. Cnty. Mar. 14, 2013) ..............................21, 23, 32, 37

*American International Group, Inc.*
  *v. Bank of America Corp.*,
  943 F. Supp. 2d 1035 (C.D. Cal. 2013) ................................21, 32, 33

*Anderson News, L.L.C. v. America Media, Inc.*,
    680 F.3d 162 (2d Cir. 2012),
    *cert. denied sub nom.*
    *Curtis Circulation Co. v. Anderson News, L.L.C.*,
    138 S. Ct. 846 (2013)..........................................................................................12

*Asset Management Fund d/b/a AMF Funds*
    *v. Morgan Stanley*,
    No. 651466/2012, NYSCEF No. 57,
    So Ordered Transcript
    (Sup. Ct. N.Y. Cnty. Aug. 27, 2013) ............................................................*passim*

*Asset Management Fund v. Bank of America Corp.*,
    No. 12-CV-04775, 2013 WL 8116709
    (C.D. Cal. Jan. 10, 2013) ............................................................................33, 41

*Bank Hapoalim B.M. v Bank of America Corp.*,
    No. 12-CV-4316, 2012 WL 6814194
    (C.D. Cal. Dec. 21, 2012) ...........................................................................*passim*

*In re Bear Stearns Mortgage Pass-Through Litigation*,
    851 F. Supp. 2d 746 (S.D.N.Y. 2012) ...............................................................35

*In re Bristol Myers Squibb Co. Securities Litigation*,
    586 F. Supp. 2d 148 (S.D.N.Y. 2008) ...............................................................12

*Cambridge Place Investment Management Inc.*
    *v. Morgan Stanley & Co.*,
    No. 10-2741-BLS1, 2012 WL 5351233
    (Mass. Super. Suffolk Cnty. Sept. 28, 2012).......................................... 40-41, 42

*Carpenter v. Longan*,
    83 U.S. 271 (1872).............................................................................................38

*CSI Investment Partners II, L.P. v. Cendant Corp.*,
    No. 600797/2000, 2001 WL 36412703
    (Sup. Ct. N.Y. Cnty. July 27, 2001) ..................................................................49

*Deutsche Zentral-Genossenschaftsbank AG,*
  *New York Branch v.*
  *Credit Suisse Holdings (USA), Inc.*,
  No. 650967/2013, NYSCEF Nos. 90,
  So Ordered Transcript
  (Sup. Ct. N.Y. Cnty June 11, 2014)............................................................*passim*

*Deutsche Zentral-Genossenschaftsbank AG,*
  *New York Branch*
  *v. Goldman Sachs Group, Inc.*,
  No. 653134/2012, NYSCEF No. 125,
  So Ordered Transcript
  (Sup. Ct. N.Y. Cnty. May 1, 2014)................................................... 20-21, 32, 36

*Deutsche Zentral-Genossenchaftsbank AG,*
  *New York Branch*
  *v. HSBC North America Holdings, Inc.*,
  No. 12 Civ. 4025, 2013 WL 6667601
  (S.D.N.Y. Dec. 17, 2013) .............................................................................*passim*

*Deutsche Zentral-Genossenschaftsbank AG,*
  *New York Branch*
  *v. Royal Bank of Scotland Group PLC*,
  No. 654569/2012, NYSCEF No. 45,
  So Ordered Transcript
  (Sup. Ct. N.Y. Cnty. June 3, 2014)........................................................20, 32, 36

*Deutsche Zentral-Genossenschaftsbank AG,*
  *New York Branch v. UBS AG*,
  No. 652575/2012, 2014 WL 1495632
  (Sup. Ct. N.Y. Cnty. Apr. 17, 2014)......................................................21, 32, 36

*Dexia Holdings, Inc. v. Countrywide Financial Corp.*,
  No. 11-CV-07165, 2012 WL 1798997
  (C.D. Cal. Feb. 17, 2012)............................................................................33, 41

*Dexia SA/NV v. Bear, Stearns & Co., Inc.*,
  929 F. Supp. 2d 231 (S.D.N.Y. 2013) .......................................................*passim*

*Dexia SA/NV v. Deutsche Bank AG*,
  No. 11 Civ. 5672, 2013 WL 98063
  (S.D.N.Y. Jan. 4, 2013).....................................................................21, 27, 50

*Federal Deposit Insurance Corp.*
*v. Countrywide Financial Corp.*,
No. 12-CV-4354, 2012 WL 5900973
(C.D. Cal. Nov. 21, 2012)...................................................................28

*Federal Home Loan Bank of Chicago*
*v. Banc of America Funding Corp.*,
No. 10 CH 45033, 2012 WL 4364410
(Ill. Cir. Ct. Cook Cnty. Sept. 19, 2012)........................................41, 44

*FHFA v. Ally Financial Inc.*,
No. 11 Civ. 7010, 2012 WL 6616061
(S.D.N.Y. Dec. 19, 2012) ...................................................................27

*FHFA v. Countrywide Financial Corp.*,
932 F. Supp. 2d 1095 (C.D. Cal. 2013)...........................................21, 28, 32, 33

*FHFA v. JPMorgan Chase & Co.*,
902 F. Supp. 2d 476 (S.D.N.Y. 2012) ..........................................*passim*

*FHFA v. Merrill Lynch & Co.*,
903 F. Supp. 2d 274 (S.D.N.Y. 2012) ...........................................21, 32, 37, 46

*FHFA v. Morgan Stanley*,
No. 11 Civ. 6739, 2012 WL 5868300
(S.D.N.Y. Nov. 19, 2012) ...................................................................37

*Flycell, Inc. v. Schlossberg LLC*,
No. 11 Civ. 0915 CM, 2011 WL 5130159
(S.D.N.Y. Oct. 28, 2011) ...................................................................51

*Fremont Investment and Loan v. Gramse, et al.*,
No 08-19019, slip op.
(Sup. Ct. Suffolk Cnty. Feb. 27, 2009).............................................39

*Glaski v. Bank of America, N.A.*,
160 Cal. Rptr. 3d 449 (Cal. Ct. App. 2013)...............................39, 40

*Goldstein v. Pataki*,
516 F.3d 50 (2d Cir. 2008) ................................................................16

*Hendricks v. U.S. Bank N.A.*,
    No. 10-849-CH, slip op.
    (Mich. Trial Ct. Washtenaw Cnty. June 6, 2011)...............................................39

*Horace v. LaSalle Bank, N.A.*,
    No. 57-CV-2008-000362.00, slip op.
    (Cir. Ct. Russel Cnty. Ala. Mar. 25, 2011).......................................................39

*HSH Nordbank AG v. Barclays Bank PLC*,
    986 N.Y.S.2d 866, 2014 WL 841289
    (Sup. Ct. N.Y. Cnty. Mar. 3, 2014) .........................................................*passim*

*HSH Nordbank AG v. Goldman Sachs Group, Inc.*,
    986 N.Y.S.2d 866, 2013 WL 8476977
    (Sup. Ct. N.Y. Cnty. Nov. 26, 2013) ......................................................*passim*

*IKB Deutsche Industriebank AG*
    *v. Credit Suisse Securities (USA) LLC*,
    No. 653122/2011, 2014 WL 859355
    (Sup. Ct. N.Y. Cnty. Mar. 3, 2014) .........................................................*passim*

*IKB International S.A. v. Bank of America*,
    12 Civ. 4036 LAK, 2014 WL 1377801
    (S.D.N.Y. Mar. 31, 2014) ...................................................................................4

*Kimmell v. Schaefer*,
    652 N.Y.S.2d 715 (N.Y. 1996) .........................................................................49

*Landesbank Baden-Württemberg*
    *v. Goldman, Sachs & Co.*,
    821 F. Supp. 2d 616 (S.D.N.Y. 2011),
    *aff'd*, 478 F. App'x 679 (2d Cir. 2012)......................................................25, 26

*Landesbank Baden-Württemberg*
    *v. RBS Holdings USA Inc.*,
    No. 12 Civ. 05476, 2014 WL 1388408
    (S.D.N.Y. Apr. 9, 2014).........................................................................*passim*

*Leyva v. National Default Servicing Corp.*,
    255 P.3d 1275 (Nev. 2011) ...............................................................................39

*Loreley Financial (Jersey) No. 3 Ltd.*
    *v. Citigroup Global Markets Inc.*,
    No. 11886, 2014 WL 1809781
    (1st Dep't May 8, 2014)........................................................16

*Massachussetts Mutual Life Insurance Co.*
    *v. Countrywide Financial Corp.*,
    No. 11-CV-10414, 2012 WL 3578666
    (C.D. Cal. Aug. 17, 2012)..................................................37

*Massachussetts Mutual Life Insurance Co.*
    *v. Residential Funding Co., LLC*,
    843 F. Supp. 2d 191 (D. Mass. 2012)................................37

*Merritt v. Bartholick*,
    36 N.Y. 44 (1867)..............................................................38

*National Bank of North America*
    *v. Flushing National Bank*,
    421 N.Y.S.2d 65 (1st Dep't 1979)......................................39

*New Jersey Carpenters Health Fund*
    *v. Royal Bank of Scotland Group, PLC*,
    709 F.3d 109 (2d Cir. 2013) .............................................19

*OSRecovery, Inc. v. One Groupe International, Inc.*,
    354 F. Supp. 2d 357 (S.D.N.Y. 2005) ...............................51

*Pennsylvania Public School Employees'*
    *Retirement System v. Bank of America*,
    939 F. Supp. 2d 445 (S.D.N.Y. 2013) ...............................12

*Pension Benefit Guaranty Corp. ex rel. St. Vincent*
    *Catholic Medical Centers Retirement Plan*
    *v. Morgan Stanley Investment Management Inc.*,
    712 F.3d 705 (2d Cir. 2013) .............................................12

*Prudential Insurance Co. of America*
    *v. Bank of America, N.A.*,
    No. 13 Civ. 1586, 2014 WL 1515558
    (D.N.J. Apr. 17, 2014) ................................................27, 46

*Prudential Insurance Co. of America*
  *v. Credit Suisse Securities (USA) LLC*,
  No. 12 Civ. 7242, 2013 WL 5467093
  (D.N.J. Sept. 30, 2013) ...............................................................*passim*

*Prudential Insurance Co. of America*
  *v. Goldman, Sachs & Co*,
  No. 12 Civ. 6590, 2013 WL 1431680
  (D. N.J. Apr. 9, 2013) ....................................................21, 32, 37, 46

*S.E.C. v. Berry*,
  580 F. Supp. 2d 911 (N.D. Cal. 2008)..............................................51

*In Re Saldivar*,
  Bankr. No. 11-10689, 2013 WL 2452699
  (Bankr. S.D. Tex. June 5, 2013) ...............................................39, 40

*Sealink Funding Ltd. v. Countrywide Financial Corp.*,
  860 F. Supp. 2d 1062 (C.D. Cal. 2012) ............................................33

*Slutsky v. Blooming Grove Inn, Inc.*,
  542 N.Y.S.2d 721 (2d Dep't 1989) ...................................................39

*Stichting Pensioenfonds ABP*
  *v. Credit Suisse Group AG*,
  966 N.Y.S.2d 349, 2012 WL 6929336
  (Sup. Ct. N.Y. Cnty. 2012) .......................................................*passim*

*Stichting Pensioenfonds ABP*
  *v. Merrill Lynch & Co., Inc.*,
  No. 10 Civ. 6637, 2013 WL 3989066
  (S.D.N.Y. July 31, 2013) ..........................................................26, 27

*Thrivent Financial for Lutherans*
  *v. Countrywide Financial Corp*.,
  No. 11-CV-07154, 2012 WL 1799028
  (C.D. Cal. Feb. 17, 2012)...........................................................33, 41

*Tsereteli v. Residential Asset Securitization Trust 2006-A8*,
  692 F. Supp. 2d 387 (S.D.N.Y. 2010) ...................................19, 32, 35

*U.S. Bank, N.A. v. Bennett*,
   No. 11 MA 40, 2012 WL 2254189
   (Ohio Ct. App. 7th Dist. June 12, 2012)............................................................39

*UBS Securities LLC*
   *v. Highland Capital Management L.P.*,
   924 N.Y.S.2d 312 (Sup. Ct. N.Y. Cnty. 2011),
   *aff'd in part, mod. in part*,
   940 N.Y.S.2d 74 (1st Dep't 2012)....................................................................51

*Union Central Life Insurance Co.*
   *v. Credit Suisse Securities (USA), LLC*,
   No. 11 Civ. 2327, 2013 WL 1342529
   (S.D.N.Y. Mar. 29, 2013) ....................................................................21, 36, 37

*Wells Fargo Bank v. Erobobo*,
   972 N.Y.S.2d 1147, 2013 WL 1831799
   (Sup. Ct. Kings Cnty. 2013) ....................................................................39, 40

*Western & Southern Life Insurance Co.*
   *v. Residential Funding Co.*,
   No. A1105042, 2012 Ohio Misc. LEXIS 100
   (Ohio Ct. Com. Pl. June 6, 2012) ....................................................................41, 42

*Western & Southern Life Insurance*
   *v. DLJ Mortgage Capital Inc.*,
   No. A1105352, slip op. (Ohio Ct. Com. Pl. May 22, 2012)..............................41

## Statutes and Rules

12 U.S.C. § 632 ....................................................................................................1

28 U.S.C. § 1291 ..................................................................................................1

28 U.S.C. § 1332 ..................................................................................................1

28 U.S.C. § 1334(b) ............................................................................................1

28 U.S.C. §1441 ..................................................................................................1

28 U.S.C. § 1452(a) ............................................................................................1

Private Securities Litigation Reform Act,
    Pub. L. 104-67, 109 Stat. 737 (1995) ........................................................... 15-16

Fed. R. Civ. P. 9(b) ..................................................................................15, 19, 51

Fed. R. Civ. P. 12(b)(6)..........................................................................1, 4, 15, 16

N.Y. U.C.C. § 3-202 .......................................................................................39

**JURISDICTIONAL STATEMENT**

Defendants-Appellees removed this action from the New York state court to the United States District Court for the Southern District of New on May 22, 2012. Defendants' Notice of Removal (Docket No. 1) stated three grounds for removal and subject-matter jurisdiction in the District Court:  (1) diversity of citizenship under 28 U.S.C. §§ 1332 & 1441 (*id.* at 3-4); (2) the Edge Act, 12 U.S.C. § 632 (*id.* at 4-5); and (3) "related to" bankruptcy jurisdiction under 28 U.S.C. §§ 1334(b) & 1452(a), based on bankruptcy proceedings commenced by several loan originators that were alleged to owe indemnity obligations to one or more Defendants (*id.* at 5-8).

This appeal is from a corrected final judgment, disposing of all Plaintiffs-Appellants' claims via dismissal pursuant to Fed. R. Civ. P. 12(b)(6), entered on April 10, 2014 (A-7-8, 892-93).[1]  Plaintiffs-Appellants filed their Notice of Appeal on May 9, 2014 (A-894-95).  This Court has jurisdiction over this appeal pursuant to 28 U.S.C. § 1291.

**STATEMENT OF THE ISSUES**

1.    Did investors in residential mortgage-backed securities ("RMBS") sufficiently allege fraud by the entities that structured and sold the securities based

---

[1] An incorrect initial judgment, containing the wrong caption, was initially entered thereupon on April 9, 2014 (A-7, 890-91).

on misrepresentations in the securities' offering documents that the originators of the underlying mortgage loans had adhered to their underwriting guidelines?

2.    Did investors in RMBS sufficiently allege fraud by the entities that structured and sold the securities based on misrepresentations in the securities' offering documents of the loan-to-value ratios of the underlying mortgage loans?

3.    Did investors in RMBS sufficiently allege fraud by the entities that structured and sold the securities based on misrepresentations in the securities' offering documents of the owner-occupancy rates of the underlying mortgage loans?

4.    Did investors in RMBS sufficiently allege fraud by the entities that structured and sold the securities based on misrepresentations in the securities' offering documents that the securities were actually backed by mortgages, *i.e.*. that the underlying mortgage loans had been validly and effectively transferred to the RMBS trust?

5.    Did investors in RMBS sufficiently allege scienter on the part of the entities that structured and sold the securities based on misrepresentations in the securities' offering documents concerning various loan quality factors, including by alleging, among many other things, that the entities were told by their due diligence service provider of widespread deviations from underwriting concerning those factors during the period in which the securities were issued?

2

6.     Did investors in RMBS sufficiently allege reliance on misrepresentations made by the entities that structured and sold the securities by alleging that they received preliminary offering documents for the securities early on and then the final prospectus supplements before the issue (or settlement) dates on which their purchases of the securities were completed?

7.     Did investors in RMBS sufficiently allege fraudulent concealment and negligent misrepresentation by the entities that structured and sold the securities based on misrepresentations in the securities' offering documents of matters uniquely within those entities' knowledge?

8.     Did investors in RMBS sufficiently allege aiding and abetting fraud on the part of certain parents and  affiliates of the entities that structured and sold the securities, which participated in or directed those entities' fraudulent activities?

## STATEMENT OF THE CASE

This action is brought under New York law, asserting common law fraud and other claims.  Plaintiffs invested more than $56 million in what were represented to be investment-grade RMBS, structured, marketed, and sold by Defendants.  The Complaint[2] alleges that Defendants misrepresented the riskiness of the mortgage loans underlying these securities – and, indeed, even

---

[2] All terms defined in the Complaint (A-9-191) are used herein as so defined.

3

misrepresented the fact that the securities were in fact backed by mortgages – thus making the securities worth far less than Plaintiffs paid for them.

Plaintiffs commenced this action by filing a Summons with Notice in the Supreme Court of the State of New York for the County of New York (Docket No. 1, Notice of Removal, Ex. A).  Following removal by Defendants to the United States District Court for the Southern District of New York (*see supra* at 1), Plaintiffs filed their Complaint (A-9-191).   Judge Lewis Kaplan referred Defendants' ensuing motion to dismiss pursuant to Fed. R. Civ. P. 12(b)(6) to Magistrate Judge Henry Pitman.    In a Report and Recommendation dated February 28, 2014 (A-824-87), Magistrate Judge Pitman recommended denying Defendants' motion on grounds of the statute of limitations, but granting Defendants' motion for failure to state a claim and thus dismissing Plaintiffs' Complaint in its entirety.  In an Order dated March 31, 2014 (A-888-89), Judge Kaplan, while questioning some of Magistrate Judge Pitman's reasoning, accepted the Magistrate Judge's recommendation to dismiss the Complaint and adopted all relevant portions of the Report.[3]  Neither Judge Kaplan nor Magistrate Judge Pitman heard oral  argument, despite Plaintiffs' request.

---

[3] The District Court's Order and the Magistrate Judge's Report and Recommendation are reported together at *IKB Int'l S.A. v. Bank of Am.*, 12 CIV. 4036 LAK, 2014 WL 1377801 (S.D.N.Y. Mar. 31, 2014).

4

A.    **Parties**

Plaintiff IKB International S.A. ("IKB SA") is a commercial bank, currently in liquidation, with its main office in Luxembourg (A-22).  IKB Deutsche Industriebank AG ("IKB AG," together with IKB SA, "IKB" or "Plaintiffs") is a commercial bank incorporated in Germany with its main office in Germany (A-22).  IKB SA purchased RMBS Certificates from Defendants (A-25).  IKB AG brought suit as assignee of the claims on certain of the Certificates (*id.*).

There are two Defendant groups:  Bank of America Corp. ("BOA Corp.") and the Defendants it owned and controlled (the "BOA Defendants" or "BOA"),[4] and Merrill Lynch & Co., Inc. ("ML & Co.") and the Defendants it owned and controlled (the "Merrill Lynch Defendants" or "Merrill Lynch")[5] (all Defendants collectively, "Defendants").  The constituents of each of these groups had overlapping officers and employees (A-29-30).  They each structured, marketed, and sold RMBS Certificates to IKB.

---

[4] In addition to BOA Corp., the BOA Defendants  comprise Bank of America, N.A. ("BOA N.A."), and Merrill Lynch, Pierce, Fenner & Smith, Inc. ("MLPF&S").

[5] In addition to ML & Co., the Merrill Lynch Defendants comprise Merrill Lynch Mortgage Investors, Inc. ("MLMI"), Merrill Lynch Mortgage Capital, Inc. ("MLMC"), and Asset Backed Funding Corporation ("ABFC").  An additional entity, Credit-Based Asset Servicing and Securitization LLC, was named as a defendant in the Summons with Notice but discontinued against in the district court.

**B.**    <u>Statement of Facts</u>

IKB invested over $56 million (A-13) in the Certificates at issue in this case because the Defendants represented that the securities were "mortgage-backed" and that the mortgages supposedly backing them had a set of specific characteristics defining the risk of the investment.  All of these representations were false: the securities were not mortgage-backed and the mortgage loans falsely represented as underlying the securities were far riskier than disclosed.  IKB purchased the RMBS Certificates in reliance on Defendants' fraudulent misrepresentations.

RMBS securitizations are the result of a process by which thousands of residential mortgage loans are pooled together in a trust that then issues investment certificates backed by the loans.  In return for their investments, holders of the certificates receive the cash flow the loans generate (A-26).

The first step in the process involves a party known as an "originator."  The originator makes the loan to the mortgagor and receives the mortgagor's note and mortgage.  The originator, in turn, sells the notes and accompanying mortgages to the investment bank arranging the securitization, also known as a "sponsor" or "seller."[6]  The sponsor, in turn, sells the loans to a "depositor," which then is

---

[6] The Defendants who served as sponsors of Trusts at issue (the "Sponsor Defendants") are BOA NA and MLMC (A-31-34).

6

responsible for transferring the loans to the issuing RMBS trust. [7] The sponsor and the depositor are both deemed "issuers" of the RMBS certificates (A-26).

Some originators require a source of funds in order to make the loans to the borrowers. Originators that need such funds sometimes secure credit from "warehouse lending facilities." An entity providing warehouse lending facilities ordinarily performs extensive due diligence research with respect to originating lenders and their lending practices in order to ensure that the originating lenders are sufficiently creditworthy (A-26-27). In this case, both BOA and Merrill Lynch had warehouse lending arrangements with originators of mortgage loans purportedly underlying the Trusts (A-53-54, 56-57), giving them special access to loan files related to those mortgage loans.

When a sponsor or seller acquires loans from an originator, it also receives the loan files that contain the mortgagors' loan applications and supporting documentation (A-27). These materials are not, as a matter of industry practice, made available to potential investors in RMBS trusts (*id.*). Rather, the investors rely on the honesty and accuracy of the representations in the offering documents for the RMBS.

---

[7] The Defendants who served as depositors for Trusts at issue (the "Depositor Defendants"; together with the Sponsor Defendants, the "Issuer Defendants") are ABFC and MLMI (A-31-34). In addition, BOA Corp. and M&L Corp. were sued as "Controlling Parent Defendants," who initiated and controlled the activities of the other Defendants in their respective groups (A-33).

Before an RMBS securitization closes, the sponsor conducts a due diligence review of (usually a statistically relevant sample of) the loan files. This review may be conducted by a third-party vendor retained by the issuer, by the issuer itself, or by both. Among other things, this due diligence review examines the originators' appraisals of the property, the resulting loan to value ("LTV") ratios, whether the properties will be occupied by the borrower, the borrowers' debt-to-income ratios, and other factors the issuer deems relevant (A-27). The offering documents make representations concerning the quality of the loans, and these representations are supposedly supported by this due diligence review (A-28). These representations routinely include such matters as the LTV and the combined LTV ("CLTV") of the loans, the percentage of properties that are owner occupied, and that the loans were originated in accordance with applicable underwriting guidelines (*id.*). Loans that do not meet underwriting criteria may, nevertheless, be included in the securitization (or "waived in") if the issuer concludes there are adequate compensating factors (A-27-28).

The Offering Documents here also repeatedly represented that the securities offered therein were "mortgage-backed" (A-76). Prior to the issuance of trust certificates, the underlying mortgage loans are supposed to be transferred to the issuing trust (A-28). Otherwise, the trust would not own the mortgage loans, and

8

the RMBS would not be "mortgage-backed" – thus losing the entire point of the investment.

Certificates representing interests in RMBS are sold to investors by underwriters.[8]  The underwriters provide potential investors with Offering Documents prepared by the Issuers (A-34-46).

As detailed in the Complaint, the Offering Documents substantially misled IKB as to the risks of the underlying loans.  The Securitizations at issue supposedly included either no loans with CLTV greater than 100% (four of the Securitizations), or less than 1% of loans with CLTV over 100% (the remaining three).  Yet IKB discovered, in a pre-suit forensic analysis, that each Securitization was larded with loans with CLTVs over 100% and that the weighted average LTV/CLTV was substantially understated.  For example, in one Securitization (ABFC 2006-OPT3), 70.2% of the loans sampled had CLTVs over 100% and the weighted average LTV/CLTV was understated by 8.7 percentage points (A-40-43).  IKB's pre-suit forensic analysis also revealed that the Offering Documents overstated the percentage of loans in each of these Securitizations that were on "owner-occupied" properties.  For example, one of the Securitizations (ABFC 2006-OPT3) overstated the owner-occupied metric by 23.9%, and the minimum

---

[8] The Defendant that served as Underwriter of Certificates at issue here is MLPF&S (in its individual capacity and as successor by merger to Banc of America Securities LLC) (the "Underwriter Defendant") (A-31-32, 34).

9

overstatement for any Securitization was 8.6% (A-48-49). The Complaint also demonstrated that the loan originators systematically abandoned their underwriting guidelines in granting the loans underlying these Securitizations despite representations to the contrary (A-66-73). And the biggest lie of all was that these securities were mortgage-backed. IKB has discovered evidence showing for each of the Securitizations at issue here that the Trusts did not hold the underlying loans (A-40-43).

Moreover, the Complaint alleged that Defendants made these misrepresentations knowingly. Clayton, a due diligence provider that both Defendant groups retained to perform due diligence on a sample of the loans from the loan pools in each of their RMBS securitizations, has reported to a governmental investigatory body that, during the period Defendants structured and sold Securitizations at issue here, it advised the two Defendant groups that 30% (BOA) and 23% (ML), respectively, of the loans it sampled did not conform with the various underwriting guidelines (A-49-50). Yet, Defendants "waived in" a large number (24.7% and 31.8%, respectively) of the sampled loans they were told were non-conforming and, knowing from the sample due diligence that the whole loan pool contained large numbers of non-conforming loans, Defendants simply left in the Securitizatons *all* the non-conforming loans in the unsampled portions of the pools (A-50-52).

10

Based on the foregoing, IKB asserted claims for common-law fraud (A-90-91), fraudulent concealment (A-92-93), negligent misrepresentation (A-94-95), and, against certain Defendants, aiding and abetting fraud (A-93-94).

**C.    The Decisions Below**

While correctly rejecting Defendants' contention that Plaintiffs' claims were barred as a matter of law by the statute of limitations (A-834-40), the Magistrate Judge nevertheless recommended the dismissal of Plaintiffs' Complaint for failure to state a claim upon which relief can be granted.  While the Magistrate Judge correctly recommended findings that Plaintiffs sufficiently alleged (a) that LTV/CLTV ratios were based on false appraisals (A-847-49), (b) that their pre-investment review processes as alleged in the Complaint rendered their reliance on Defendants' misrepresentations reasonable (A-878-79), and (c) loss causation (A-879-81), he nevertheless recommended dismissal of Plaintiffs' claims in their entirety.

While disagreeing with some of the Magistrate Judge's reasoning, Judge Kaplan followed the Magistrate Judge's recommendation and adopted all relevant parts of the Report (A-888).

**SUMMARY OF THE ARGUMENT**

The court below failed to give the Complaint a fair reading because it parsed the allegations one by one, finding each alleged factor insufficient by itself to

support Plaintiffs' claims, instead of reading the Complaint "'as a whole,' rather than piecemeal," as must be done on a motion to dismiss.  *Anderson News, L.L.C. v. American Media, Inc.*, 680 F.3d 162, 190 (2d Cir. 2012), *cert. denied sub nom. Curtis Circulation Co. v. Anderson News, L.L.C.*, 138 S. Ct. 846 (2013).[9]  When the allegations of the Complaint here are taken as a whole, with the alleged facts considered in the aggregate rather than piecemeal and all plausible inferences drawn in favor of the Plaintiffs, it is clear that Plaintiffs have stated a claim upon which relief can be granted.

### Abandonment of Underwriting Guidelines

Thus, the Complaint contained pages of allegations of deviation from the loan originators' underwriting guidelines in loans underlying the Securitizations at issue, and also (among other things) that Defendants were advised by their due diligence provider of widespread deviation in the loan pools underlying the RMBS

---

[9] *See e.g.*, *Pension Ben. Guar. Corp. ex rel. St. Vincent Catholic Med. Centers Ret. Plan v. Morgan Stanley Inv. Mgmt. Inc.,* 712 F.3d 705, 732 (2d Cir. 2013) ("[I]t is well-settled that a complaint must be read as a whole, not parsed piece by piece to determine whether each allegation, in isolation, is plausible.") (quotation marks omitted) *Pennsylvania Pub. Sch. Emps' Ret. Sys. v. Bank of Am.*, 939 F. Supp. 2d 445, 455 (S.D.N.Y. 2013) ( "Taken collectively, the allegations . . . plausibly state a strong inference that [the defendant] acted with scienter;" rejecting defendants' "atomized approach to scienter" because "no single allegation need conclusively establish scienter");  *In re Bristol Myers Squibb Co. Sec. Litig.*, 586 F. Supp. 2d 148, 166 (S.D.N.Y. 2008) ("In order to determine whether a complaint has adequately pleaded scienter, a court should examine all of the facts alleged collectively or 'holistically' (without parsing individual allegations)").

12

securitizations during the period the Securitizations here were issued.  The court below nevertheless dismissed Plaintiffs' fraud claim based on the misrepresentation that the originators' underwriting guidelines had been adhered to because the Complaint failed to specifically "tie" the due diligence provider's advice to specific loans in the specific pools for the specific Securitizations at issue.  As the great weight of authority recognizes, however, once a systematic departure from guidelines is alleged, such "tying" is unnecessary at the pleading stage – it would require a gross statistical anomaly for the particular loans in the particular Securitizations to be unaffected.

### LTV/CLTV

The Complaint also contained page after page of allegations showing substantial deviations between the LTV/CLTV ratios as represented in the Offering Materials and those that obtained in reality, and that Defendants were advised by their due diligence provider of widespread deviations regarding LTV/CLTV ratios of loans in the pools underlying Defendants' RMBS securitizations during the period the Securitizations here were issued – and that at least one Defendant group even pressured originators to inflate the appraisals upon which the LTV/CLTV ratios were based.  Yet the court below dismissed Plaintiffs' fraud claim based on LTV/CLTV on the ground that Plaintiffs did not plead sufficient facts to show that Defendants knew, at the time of their representations, of the falsity of the

13

appraisals, again because they failed to "tie" the due diligence provider's advice of widespread deviations to specific loans in the specific Securitizations at issue. Again, to require such "tying" at the pleading stage is to draw implausible inferences against the Plaintiffs.

### **Owner-Occupancy Rates**

The Complaint similarly contained page after page of allegations showing that the owner-occupancy rates represented by Defendants in the Offering Materials for the RMBS at issue were greatly inflated. The court below dismissed Plaintiffs' fraud claim based on misrepresentation of owner-occupancy rates because the Offering Documents stated that the rates they represented were based on representations made by borrowers. That disregarded the Complaint's plain allegations that the Defendants ***knew*** from due diligence that the owner-occupancy rates stated in the Offering Documents were false.

### **"Mortgage-Backed" Securities**

Finally, the Complaint alleged that Defendants misrepresented even the fact these securities were mortgage-backed. The court below did not queston that the Complaint pled facts giving rise to a plausible inference that underlying mortgage loans were not, in fact, timely transferred to the RMBS Trusts – but nevertheless held that the falsity of the single central representation regarding these securities did not give rise to a fraud claim because the transfer of the mortgage loans to the

14

Trusts was the subject of a contract, such that the only claim was for breach of that contract. The Plaintiffs, however, were not parties to the contracts that provided for such transfers; their claim is not for breach of those contracts, but rather for fraud for the misrepresentations Defendants made to them.

**<u>Reliance</u>**

The Complaint alleged an exacting process by which Plaintiffs and their agents reviewed the various preliminary and final Offering Documents and the information conveyed therein. The Court below found that these allegations pled reliance that was reasonable. The Court below nevertheless found a failure to plead actual reliance because the last Offering Documents for each Securitization (the final Prospectus Supplements) were released after the trade dates on which Plaintiffs placed their orders for the RMBS – but before the settlement or issue dates, on which the purchases were completed. The settlement or issue date, on which the transaction becomes final, is, however, the date that controls.

For these and other reasons stated in detail below, the judgment dismissing Plaintiffs' complaint should be reversed and Plaintiffs' Complaint reinstated.

## <u>ARGUMENT</u>

This appeal involves a motion to dismiss state-law claims including fraud, subject to Fed. R. Civ. P. 12(b)(6) & 9(b), but not the special pleading requirements of the Private Securities Litigation Reform Act, Pub. L. 104-67, 109

15

Stat. 737 (1995).  A district court's grant of a Rule 12(b)(6) motion to dismiss is reviewed *de novo*, accepting all factual claims in the complaint as true and drawing all reasonable inferences in the plaintiff's favor.  *Goldstein v. Pataki*, 516 F.3d 50, 56 (2d Cir. 2008).  Under the *de novo* standard, this Court gives no deference to the District Court's decision to dismiss all claims.

## POINT  I

## <u>PLAINTIFFS ADEQUATELY PLED A FRAUD CLAIM</u>

The elements of a fraud claim under New York law are "[i] a misrepresentation or a material omission of fact which was false and known to be false by defendant, [ii] made for the purpose of inducing the other party to rely upon it, [iii] justifiable reliance of the other party on the misrepresentation or material omission, and [iv] injury."  *Loreley Financing (Jersey) No. 3 Ltd. v. Citigroup Global Markets, Inc.*, 2014 WL 1809781, at *1 (1st Dep't May 8, 2014).

The court below found that plaintiffs satisfied the "injury" element (implicating some aspects of "loss causation" as is required under federal law) (A-879-81).  Materiality was not contested below; nor was it contested that the representations at issue were made for the purpose of inducing Plaintiffs to invest (*see* A-830).

As to the elements of falsity and scienter (*i.e.*. knowledge of the untruth of the representations), the reasoning of the court below is confused, conflating key

elements of Plaintiffs' fraud claim. Throughout the Magistrate Judge's Report, discussion appeared under the heading of "falsity" that really addressed the element of scienter. Indeed, several times under the heading of "falsity," the Magistrate Judge's Report (adopted by the District Court) accepted the Complaint's allegations that Defendants' representations were false – but nevertheless recommended dismissal because the Complaint did not, in the view of the court below, adequately allege that Defendants *knew* their statements were false (*i.e.*, acted with scienter). As shown below, this confusion of key elements prevented the court below from properly analyzing the Complaint's allegations. We will discuss each type of misrepresentation separately in turn, disentangling the falsity and scienter elements, and then briefly address the brief general finding the court below placed under the heading of "scienter."

We will finally address the ruling of the court below as to reliance.

**A.    Abandonment of Underwriting Guidelines**

**1.    Falsity**

The Complaint contained page upon page of detailed allegations setting forth public findings and reports that originators of loans included in these Securitizations had systematically abandoned their own underwriting guidelines (A-64-73). These included detailed, extensive allegations of governmental investigations of the operations of the very originators at issue here during the

17

period at issue, governmental sanctions against those originators, news reports of poor mortgage loan underwriting by those originators during the relevant period, placement of those originators on "worst originators lists," and more (*id.*).

The court below nevertheless dismissed Plaintiffs' fraud claim insofar as it was based on a systematic departure from underwriting guidelines that Defendants had represented were be complied with (A-863-64). The Magistrate Judge's Report stated that "[a]part from the LTV ratios, CLTV ratios and owner-occupancy issues . . . , the complaint does not identify any specific departures from underwriting guidelines by any of the originators with respect to the loans included in the securitizations in issue" (A-863) – as if abandonment of those key guidelines would somehow not be sufficient to make out a claim for misrepresenting compliance with underwriting guidelines.

The court below found the Complaint's extensive allegations insufficient because, although they pertained to either the same originators as are involved here or the same issuers, and even though they alleged occurrences during the same time period as the Certificates here were issued, they were not directly "tied" to specific mortgage loans in the specific Securitizations at issue (A-864-66). To conclude that these allegations have nothing to do with the loans in the Securitizations at issue would require drawing an implausible inference against the

18

pleader, that the loans in the Securitizations somehow escaped the consequences of the originators' regular practices and conduct during the period at issue.

As was recently found in a fraud case analyzing case law from this Circuit and the Southern District, "the weight of authority" rejects any requirement that a plaintiff alleging systematic abandonment of underwriting guidelines tie the allegations of abandonment to the particular securitizations at issue; allegations establishing that the abandonment was systematic suffice to plead the falsity of a representation that underwriting guidelines had been adhered to. *Allstate Ins. Co. v. Credit Suisse Sec. (USA) LLC*, 986 N.Y.S.2d 864, 2014 WL 432458, at *10 (Sup. Ct. N.Y. Cnty. 2014) ("the weight of the authority indicates that . . . allegations of systematic underwriting failure are sufficient to state a claim and do not need to be accompanied by reference to specific loans in the securitization pools of the Certificates") (quoting *Stichting Pensioenfonds ABP v. Credit Suisse Group AG*, 966 N.Y.S.2d 349, 2012 WL 6929336, at *8 (Sup. Ct. N.Y. Cnty. Nov. 30, 2012) ("*Stichting*"));[10] *see, e.g.*, *Dexia SA/NV v. Bear, Stearns & Co., Inc.*, 929 F. Supp. 2d 231, 238 (S.D.N.Y. 2013) (allegations of systematic abandonment

---

[10] Among the cases discussed in *Allstate* are this Court's decision in *N.J. Carpenters Health Fund v. Royal Bank of Scotland Grp., PLC*, 709 F.3d 109, 122 & n.6 (2d Cir. 2013), and the District Court's decision in *Tsereteli v. Residential Asset Securitization Trust 2006-A8*, 692 F. Supp. 2d 387, 392 (S.D.N.Y. 2010). Although those cases were decided under Rule 8(a) rather than Rule 9(b), they are, as *Allstate* recognized, persuasive authority in fraud cases as well – especially here, where the Complaint is considerably more detailed than the complaints as described in those decisions.

"present a picture of defendants' unsound mortgage origination and securitization practices so pervasive that a reasonable fact-finder could infer that those practices affected the securitizations at issue in this case"); *Allstate Ins. Co. v. Countrywide Fin. Corp*., 824 F. Supp. 2d 1164, 1185 n. 23 (C.D. Cal. 2011) ("[R]epresentations relating to Countrywide's underwriting practices are sufficiently pleaded as applying to Countrywide's entire operation and therefore to the specific Offerings purchased by Allstate.").  Allegations even less detailed than these have been held to adequately support fraud claims for abandonment of underwriting guidelines at the pleading stage.  *See*, *e.g., Prudential Ins. Co. of Am. v. Credit Suisse Sec. (USA) LLC,* No. 12 Civ. 7242, 2013 WL 5467093, at *8-12, *15 (D.N.J. Sept. 30, 2013) ("*Prudential*") (upholding fraud claim based on Clayton Report, "worst originators" lists, governmental complaints, and reports of general wrongdoing by originators).[11]

---

[11] Indeed, many federal and state courts have held allegations substantially identical to those here sufficient to state a fraud claim regarding abandonment of underwriting guidelines.  *Landesbank Baden-Württemberg v. RBS Holdings USA Inc*., No. 12 Civ. 05476 (PGG), 2014 WL 1388408, at *12-13 (S.D.N.Y. Apr. 9, 2014) ("*LBBW v. RBS*"); *Bank Hapoalim B.M. v Bank of Am. Corp*., No. 12-CV-4316-MRP (MANx), 2012 WL 6814194, at *7 (C.D. Cal. Dec. 21, 2012) ("*Bank Hapoalim*"); *Deutsche Zentral-Genossenschaftsbank AG, New York Branch  v. Credit Suisse Holdings (USA), Inc.*, No. 650967/2013, NYSCEF Nos. 90, So Ordered Transcript at 29:7-30:18 (Sup. Ct. N.Y. Cnty. June 11, 2014) ("*DZ v. Credit Suisse*") (SPA-33-34); *Deutsche Zentral-Genossenschaftsbank AG, New York Branch v. Royal Bank of Scotland Grp. PLC*, No. 654569/2012, NYSCEF No. 45, So Ordered Transcript at 23:16-24:14 (Sup. Ct. N.Y. Cnty. June 3, 2014) ("*DZ v. RBS*") (SPA-58-59); *Deutsche Zentral-Genossenschaftsbank AG, New*

Plaintiffs also alleged, as proof of a systematic abandonment of underwriting

guidelines, the information contained in a Report provided to the governmental

Financial Crisis Inquiry Commission (and now made publicly available) by

---

*York Branch Branch v. Goldman Sachs Grp., Inc.*, No. 653134/2012, NYSCEF
No. 125, So Ordered Transcript at 52:9-53:6 (Sup. Ct. N.Y. Cnty. May 1, 2014)
("*DZ v. Goldman Sachs*") (SPA-115-16); *Deutsche Zentral-Genossenschaftsbank
AG, New York Branch v. UBS AG*, No. 652575/2012, 2014 WL 1495632, at *1
(Sup. Ct. N.Y. Cnty. Apr. 17, 2014) ("*DZ v. UBS*"); *IKB Deutsche Industriebank
AG v. Credit Suisse Securities (USA) LLC*, No. 653122/2011, 2014 WL 859355, at
*7 (Sup. Ct. N.Y. Cnty. Mar. 3, 2014) ("*IKB v. Credit Suisse*"); *HSH Nordbank
AG v. Barclays Bank PLC,* 986 N.Y.S.2d 866, 2014 WL 841289, at *15-18, 19-20
(Sup. Ct. N.Y. Cnty. Mar. 3, 2014) ("*HSH v. Barclays*");  *HSH Nordbank AG v.
Goldman Sachs Grp., Inc.*, 43 Misc. 3d 1225(A), 2013 WL 8476977, at *4 (Sup.
Ct. N.Y. Cnty. Nov. 26, 2013) ("*HSH v. Goldman Sachs*"); *Asset Mgmt. Fund
d/b/a AMF Funds v. Morgan Stanley*, No. 651466/2012, NYSCEF No. 57, So
Ordered Transcript at 52:19-53:11, 69-71 (N.Y. Sup. Ct. N.Y. Cnty. Aug. 27,
2013) ("*AMF v. Morgan Stanley*") (SPA-177-78, 194-96); *but see Deutsche
Zentral-Genossenchaftsbank AG, New York Branch v. HSBC N. Am. Holdings,
Inc.,* No. 12 Civ. 4025, 2013 WL 6667601, at *19-21 (S.D.N.Y. Dec. 17, 2013)
("*DZ v. HSBC*" or "*DZ Bank*").

A multitude of other federal and state court cases have upheld such claims
based on similar or even less detailed allegations than those here.  *See e.g.*, *Dexia
SA/NV v. Bear, Stearns*, 929 F. Supp. 2d at 236-44; *Fed. Housing Fin. Agency
("FHFA") v. Merrill Lynch & Co.*, 903 F. Supp. 2d 274, 278 (S.D.N.Y. 2012);
*Prudential v. Credit Suisse Sec. (USA) LLC*, No 2:12-cv-07242, 2013 WL
5467093, at *7-11, *15-17  (D. N.J. Sept. 30, 2013);  *Prudential Ins. Co. of Am. v.
Goldman, Sachs & Co*, No. 12-cv-6590, 2013 WL 1431680, at *7 (D. N.J. Apr. 9,
2013); *Am. Int'l Grp., Inc. v. Bank of Am. Corp.*, 943 F. Supp. 2d 1035, 1055-56
(C.D. Cal. 2013) ("*AIG*"); *FHFA v. Countrywide Fin. Corp.*, 932 F. Supp. 2d 1095,
1110-13, 1116 (C.D. Cal. 2013); *Allstate v. Credit Suisse*, 2014 WL 432458, at *7-
10, 12-13; *Allstate Ins. Co. v. Merrill Lynch & Co*., No. 650559/2011, 2013 WL
4046711, at *11-13 (Sup. Ct. N.Y. Cnty. Mar. 14, 2013); *Stichting*, 2012 WL
6929336, at *6-11; *but see, e.g.*, *Dexia SA/NV v. Deutsche Bank AG*, No. 11 Civ.
5672, 2013 WL 98063, at *4-7 (S.D.N.Y. Jan. 4, 2013); *Union Cent. Life Ins. Co.
v. Credit Suisse Sec. (USA), LLC*, No. 11 Civ. 2327, 2013 WL 1342529, at *7
(S.D.N.Y. Mar. 29, 2013).

Clayton, a due diligence service provider that Defendants retained to review statistically relevant samples of the mortgage loans proposed for inclusion in each of Defendants' securitizations, reporting on the RMBS due diligence results it had provided to Defendants during the period at issue here.  (*See* A-15-16, 49-50.)[12] The court below found that data included in the Clayton Report did not support an inference of a systematic abandonment of underwriting guidelines.  The Magistrate Judge's Report noted that, for each defendant group, Clayton found that "only" 30% (BOA) and 23% (Merrill Lynch), respectively, of the sampled mortgage loans were non-conforming, and that Defendants insisted on including "only" about 27.4% (BOA) and a 31.8% (Merrill Lynch), respectively, of those deviant loans from the sample in their pools despite Clayton's advice, resulting (by the Magistrate Judge's reasoning) in a deviation rate of "only" about 10% (A-868-70).

First, a motion to dismiss is not the place to determine, as a matter of law, that certain numeric quantities or percentages are or are not sufficient to establish a fraud.  Indeed, this Circuit has previously found that a district "court's exclusive reliance on a single numerical or percentage benchmark . . . was error."  228 F.3d at 162.  *Cf. id.* at 166 ("We believe it is inappropriate to determine at this stage of

---

[12] The Clayton Report covered the period during which the majority of the seven Securitizations in this case were issued (January 1, 2006 to June 30, 2007). Three of the Securitizations (CBASS 2005-CB6, MLMI 05-SL3, and SURF 05-AB2) were issued in the three months immediately preceding the period covered by the Clayton Report, although Defendants did not dispute that they also used Clayton during that earlier time period.

22

the litigation that [overstatement of income by 17.7% after tax and 11.7% pre-tax for a given quarter, and of 11.9% after tax and 8% pre-tax for a period of six months], both in absolute terms and as percentages of total net income ... were immaterial as a matter of law.").

It is, therefore, not surprising that fraud claims relating to abandonment of underwriter guidelines have been upheld on the basis of allegations of deviation rates and subsequent "waive-ins" reported in the Clayton Report in similar percentages to those here. *See, e.g., Allstate  v. Merrill Lynch*, 2013 WL 4046711, at *3, 13 (sustaining fraud claims premised on allegation that Clayton identified 23% of reviewed loans as non-conforming and lacking compensating factors, and 33% of those non-conforming loans were then waived in to securitizations, leaving less than 10% of the sample non-conforming); *Prudential*, 2013 WL 5467093, at *9 (same, except Clayton initially identified 32% of the loans as non-conforming and lacking compensating factors before "waive-in").

Second, the court below was wrong in determining that the Clayton Report showed the deviation rate of the loans in the Securitizations' pools was "only" about 10% following the "waive-in" process (A-868-69).  That disregarded the fact that Clayton reviewed only *a sample* of the loans included in each of Defendants' securitizations, and thus failed to consider the vast majority of the loans in each securitization that Clayton ***did not*** sample, all of which remained in the

23

securitizations despite Clayton's findings of high deviation rates in the samples (A-51). ***It could fairly be inferred that those unsampled loans included similarly high percentages (namely, 30% and 23%) of non-conforming loans as the sampled loans***. Unlike the samples, where some of the loans found non-conforming were removed from the pools after Clayton reported them, the fair inference was that the much larger unsampled portions of the loan pools contained like percentages (30% and 23%) of deviant loans ***that were not removed*** (*see id.*). Allegations reciting such high rates of corruption in the loan pools were sufficient to raise an inference of widespread abandonment of underwriting guidelines.

## 2.   <u>Scienter</u>

While placing this discussion under the rubric of "falsity," the court below also found that Plaintiffs failed to sufficiently allege Defendants' knowledge of such systematic abandonment (*i.e.,* scienter) (A-864-74).  Plaintiffs alleged, however, that Defendants were apprised of systematic deviations from underwriting criteria by reports provided to them, on a securitization-by-securitization basis, during the period in which Securitizations in this case were issued by Defendants' due diligence service provider Clayton.  These securitization-by-securitization reports were summarized retrospectively by Clayton in the Report it provided to the FCIC.  (*See* A-15-16, 49-50.)

The Magistrate Judge's Report relied on *Landesbank Baden-Württemberg v. Goldman, Sachs & Co.*, 821 F. Supp. 2d 616 (S.D.N.Y. 2011), *aff'd*, 478 F. App'x 679 (2d Cir. 2012) (A-864-65),[13] in recommending the finding that Plaintiffs' allegations that the Clayton Report shows that Defendants were aware of the widespread abandonment of underwriting guidelines are insufficient because Plaintiffs do not "tie" the information in the Clayton Report to the specific Securitizations at issue in this case (*id.*).  *Landesbank Baden-Württemberg* is off-point:  there, plaintiffs relied on Clayton due diligence findings first provided to defendant Goldman Sachs ***after*** Goldman had made the alleged false representations and issued the securities plaintiff purchased.  *See* 478 F. App'x at 681-82.

Here, in contrast, the Clayton due diligence findings cited in the Complaint (as summarized in the Clayton Report submitted to the FCIC) were provided to Defendants on a securitization-by-securitization basis ***prior to*** Defendants' representations about the Securitizations and ***prior to*** the issuance of the Securitizations.  As another court in the Southern District said in distinguishing *Landesbank Baden-Württemberg* on this very basis, the Complaint "does not allege that the defendants had access to the [Clayton] report itself when they marketed these securities; rather, it cites the report as evidence of ***information that Clayton***

---

[13] This Court's decision in *Landesbank Baden-Württemberg* was a Summary Order of no precedential effect.  2d Cir. R. 32.1.1(a).

25

***communicated to the defendants on a rolling basis between the first quarter of***

***2006 and the second quarter of 2007***.”  *FHFA v. JPMorgan Chase & Co.*, 902 F.

Supp. 2d 476, 492 n.15 (S.D.N.Y. 2012) (emphasis added); *see HSH v. Goldman*

*Sachs*, 2013 WL 8476977, at *7 & n.6 (denying motion to dismiss based on

virtually identical Clayton allegations and finding scienter allegations sufficient

because the Clayton Report to the FCIC provided evidence of the information that

the defendants received from Clayton “on a rolling basis” and had prior to

marketing the certificates at issue); *see also Prudential*, 2013 WL 5467093, at *15

& n.9 (discussing and distinguishing *Landesbank Baden-Württemberg*).

    As with pleading falsity, the weight of authority rejects the requirement that

allegations of knowledge of systematic abandonment be “tied” to the specific

mortgage loans in the specific securitizations at issue.[14]  *See, e.g., IKB v. Credit*

---

[14] A prior District Court decision rejecting the use of the Clayton Report to allege knowledge of falsity without allegations “tying” it to the particular trusts at issue, *Stichting Pensioenfonds ABP v. Merrill Lynch & Co., Inc.*, No. 10 Civ. 6637 (LAK), 2013 WL 3989066, at *5 (S.D.N.Y. July 31, 2013), did not compel a like result here.  In that case, the Clayton Report was virtually the ***only*** basis for plaintiffs’ allegations – except for certain confidential witness allegations cribbed from other law firms’ complaints with no indication that plaintiff’s counsel had consulted the witnesses involved.  *See id.* *3-4.  Here, Plaintiffs conducted forensic loan-level investigations showing the misrepresentations made with respect to specific underwriting metrics relating to mortgage loans included in the specific Securitizations at issue (*see* A-41-44, 46-49).  Moreover, the complaint in *Stichting*, unlike the Complaint here, did not allege that the Clayton Report summarized due diligence reports provided by Clayton to the defendants during the period securitizations being sued on were issued (but only said that Clayton provided due diligence services to defendants “during the housing boom”), and

*Suisse*, 2014 WL 859355, at *7 (sustaining fraud claims where "the pleading of

scienter is supported by plaintiffs' reliance on Clayton's performance of due

diligence. . . [and allegations] that Clayton provided detailed reports to defendants

during and prior to the preparation of the Offering Documents"); *HSH v. Barclays*,

2014 WL 841289, at *15-18 (same). [15]

---

failed to allege when Clayton provided due diligence services to defendants or even that "Clayton's due diligence implicated in any way the mortgages underlying the security at issue." 2013 WL 3989066, at *5.

    Plaintiffs respectfully submit that the recent district court decision in *DZ Bank*, 2013 WL 6667601, at *17-18 (A-835, 845, 846-47, 876) , was incorrect insofar as it refused to consider the Clayton Report as giving rise to a strong inference of scienter and contrary to the significant weight of authority. *See, e.g., Prudential*, 2013 WL 5467093, at *8-12, *15; *Dexia v. Deutsche Bank*, 2013 WL 98063, at *8 ("DBSP was aware from the Clayton reviews of those loans that many of the loans egregious' deficiencies."); *JPMorgan Chase & Co.*, 902 F. Supp. 2d at 492 (denying motion to dismiss fraud claims based on, inter alia, the Clayton report revealing that "between the first quarter of 2006 and the second quarter of 2007, JPMorgan was informed that up to 27% of the loans that it proposed for securitization were not originated in accordance with represented underwriting standards.").

    [15] *See also, e.g., FHFA v. Ally Fin. Inc.,* No. 11 Civ. 7010 (DLC), 2012 WL 6616061, at *2-3 (S.D.N.Y. Dec. 19, 2012) (sustaining fraud claims premised on a systematic disregard of underwriting standards where plaintiff cited, *inter alia*, the Clayton Report's findings and the defendants' representations regarding their due diligence); *JPMorgan Chase & Co.*, 902 F. Supp. 2d 476, 492, 494-95 (S.D.N.Y. 2012) (same); *see also, e.g., Prudential Ins. Co. of Am. v. Bank of Am., N.A.,* No. 13 Civ. 1586, 2014 WL 1515558, at *13 (D.N.J. Apr. 17, 2014) ("Clayton [Report] allegations provide a nearly sufficient factual foundation on their own. Far from adding nothing to Plaintiffs' case, these allegations are astonishing, highly relevant, and strongly support the plausibility of the underwriting abandonment theory."); *FHFA v. Countrywide*, 932 F. Supp. 2d at 1112 (in a fraud case, "this Court again rejects the proposition that plaintiffs must allege that Countrywide's abandonment of underwriting guidelines affected the mortgage pools underlying the RMBS that

Indeed, with respect to Defendant Merrill Lynch, the Complaint alleged that Merrill Lynch not only knew of originators' deviations from underwriting guidelines, but, according to another due diligence service provider Merrill Lynch used during the period at issue (Bohan) and at least one originator of mortgage loans purportedly included in the pools underlying Trusts that IKB purchased (Ownit), Merrill Lynch *affirmatively demanded that originators deviate from their guidelines* (A-61-63).  The Complaint additionally alleged that an employee of another due diligence service provider Merrill Lynch retained (Bohan) had stated that Merrill Lynch pressured Bohan to approve loans rather than to find them non-conforming and found ways to keep loans Bohan found non-conforming in the pools for their securitizations (A-55).

The court below rejected these allegations because, even though they were well documented, they were not tied to specific loans in the Securitizations (A-870).  Just as with the Clayton Report, this "tying" requirement requires the implausible inference that documented misconduct during the time the Certificates were issued, by entities specifically involved with the Certificates, did not affect the Certificates at all.  Indeed, precisely such allegations have been held to adequately support fraud claims relating to abandonment of underwriting

FHFA purchased") (citing *Bank Hapoalim*, 2012 WL 6814194, at *7 (fraud case)); *FDIC v. Countrywide Fin. Corp.*, No. 12-CV-4354, 2012 WL 5900973, at *6 (C.D. Cal. Nov. 21, 2012) (fraud case); *Allstate v. Countrywide*, 824 F. Supp. 2d at 1184 n.23 (fraud case).

guidelines, without reference to the specific securitizations at issue. *See, e.g,
Dexia v. Bear, Stearns*, 929 F. Supp. 2d at 241 (upholding fraud claim on
allegation that the defendants pressured appraisers and rating agencies to change
their appraisals, findings, and ratings); *JPMorgan Chase & Co.*, 902 F. Supp. 2d at
496 (upholding fraud claim on allegation that the defendants pressured appraisers
to issue inflated property appraisals); *Allstate v. Countrywide*, 824 F. Supp. 2d at
1185-87 (upholding fraud claim on allegations that defendant pressured appraisers
to inflate appraisals); *supra* at 19-20 &  n.11.[16]

Moreover, contrary to the statement in the Magistrate Judge's Report that
Plaintiffs did not allege facts showing that Defendants knew that the originators
were not complying with their own guidelines (A-872-73), the Clayton Report
itself showed that Defendants had such knowledge, as it summarized due diligence
reports that Defendants received from Clayton, on a securitization-by-
securitization basis, during the period they issued Certificates at issue here (A-49-
50).

Further, the Complaint alleged overlaps in ownership and control between
some Defendants and at least two originators of loans included in the
Securitizations at issue (A-58-59) and warehouse lending arrangements with

---

[16] Since the Complaint alleged that Defendants knew that the originators had
systematically abandoned their underwriting guidelines, the court below was
wrong to find that Defendants cannot be liable for repeating the originators'
representations concerning such compliance (Rep. 49-50).

certain of the originators, thus giving them detailed information regarding those originators' lending practices (A-53-54, 56-58) . The Magistrate Judge's Report observed that cases that have accepted such allegations have involved claims that did not sound in fraud (A-871). In fact, such allegations have been ruled to adequately support fraud claims on motions to dismiss. *See Prudential*, 2013 WL 5467093, at *16-17 (warehouse lending arrangements between defendants and loan originators supported an inference of scienter); *Allstate v. Credit Suisse*, 2014 WL 432458 (sustaining fraud claims on allegations that a defendant or its affiliates originated the securitized loans or acquired them pursuant to warehouse lending arrangements); *Stichting*, 2012 WL 6929336, at *10 (sustaining fraud claims on allegation that a defendant and "its affiliated entities were involved in every step of the complex process that eventually resulted in the [RMBS] Certificates"); *see also HSH v. Barclays*, 2014 WL 841289, at *17 ("Plaintiffs′ scienter pleading is supported not only by their allegations as to Clayton's due diligence, but also by their allegation that defendant Barclays Bank, in its capacity as warehouse lender to originator New Century, performed due diligence on New Century's 'operations,' and thus, inferentially, had access to information about the true quality of the loans.") (citing *HSH v. Goldman Sachs*, 2013 WL 8476977, at *9).

30

**B.** **LTV/CLTV Ratios**

**1.** **Falsity**

LTV/CLTV is the ratio of the amount of a loan to the value of the mortgaged property securing it; the higher the ratio, the riskier the loan.  The Complaint alleged that Defendants intentionally understated the LTV/CLTV ratios on the mortgage loans purportedly underlying the Securitizations in order to make the investments seem less risky than they were (A-36-46).

The Complaint contained page after page of detailed allegations providing evidence that the LTV/CLTV ratios represented in the Offering Documents were false (A-41-44).  For example, consider the important factor of whether any mortgage loans in the pools underlying the Certificates had LTV/CLTV ratios of greater than 100% – meaning that the amount of the loan exceeded the value of the property securing it.  The Offering Documents represented that no or almost no mortgage loans in the underlying pools had LTV/CLTV ratios of over 100% (A-41, 44).  Yet the forensic analysis conducted by Plaintiffs prior to preparing their Complaint revealed that the percentages of the several loan pools with LTV/CLTV exceeding 100% ranged from nearly 20% of the loans in the pools to more than 70% (*id.*).  Thus, it is not surprising court below found that Plaintiffs had adequately alleged that the LTV/CLTV ratios represented in the Offering Documents were false (A-847-49).

31

## 2.    **Scienter**

Nevertheless – still under the rubric of "falsity" – the court below found that the Complaint failed to state a fraud claim for LTV/CLTV representations. That was because the appraisals upon which those representations were based were "mere statements of opinion" whose falsity defendants were not adequately alleged to have known of at the time they were made (*i.e.,* scienter) (A-844-47). Dismissal on that ground was erroneous.[17]

While the Magistrate Judge's Report (A-844-45) – and the District Court's order (A-888) – cited federal securities law cases for the standard applicable to claims of fraud based on appraisals as statements of "opinion" (A-844-45), the correct standard under New York common law was set forth by Judge Pfaelzer of

---

[17] A large number of cases have sustained claims of fraud regarding LTV/CLTV ratios at the pleading stage based on allegations virtually identical to IKB's here. *Bank Hapoalim*, 2012 WL 6814194, at *5-7; *DZ v. Credit Suisse*, at 29:7-30:18 (SPA-33-34); *DZ v. RBS*, at 23:16-24:14 (SPA-58-59); *DZ v. Goldman Sachs*, at 52:9-53:6 (SPA-115-16); *DZ v. UBS*, 2014 WL 1495632, at *1; *IKB v. Credit Suisse*, 2014 WL 859355, at *7; *HSH v. Barclays*, 2014 WL 841289, at *15-18, 19-20; *HSH v. Goldman Sachs*, 2013 WL 8476977, at *5; *AMF v. Morgan Stanley*, at 52:19-53:11, 69-71 (SPA-177-78, 194-96); *but see LBBW v. RBS*, 2014 WL 1388408, at *14; *DZ Bank*, 2013 WL 6667601, at *19-21. A large number of cases have also sustained such fraud claims based on allegations similar to – or less detailed than – those here. *See, e.g.*, *Dexia v. Bear, Stearns*, 929 F. Supp. 2d at 236-42; *Prudential v. Credit Suisse*, 2013 WL 5467093, at *12-13, *17; *Prudential v. Goldman Sachs*, 2013 WL 1431680, at *7; *AIG*, 943 F. Supp. 2d at 1055; *Stichting*, 2012 WL 6929336, at *6-11; *FHFA v. Countrywide*, 932 F. Supp. 2d at 1107-10; *Allstate v. Credit Suisse*, 2014 WL 432458, at *10; *Allstate v. Merrill Lynch*, 2013 WL 4046711, at *11-13; *but see, e.g.*, *DZ v. HSBC*, 2013 WL 6667601, at *19-21; *FHFA v. Merrill Lynch*, 903 F. Supp. 2d at 278; *but see also Tsereteli*, 692 F. Supp. 2d at 393-94.

the Central District of California[18] in *Allstate v. Countrywide*, 824 F. Supp. 2d at 1185-87 (applying New York law).  As Judge Pfaelzer held, representations of LTV/CLTV ratios based on appraisals are actionable under New York law as misrepresentations ***of fact*** (not opinion) when the plaintiff alleges that the Defendants "did not subjectively believe the opinions that [they] included in the Offering Documents."  *Id.* at 1185.  Judge Pfaelzer held that plaintiff met that burden in *Allstate* by "alleging that [Defendant] 'did not genuinely believe the appraisal values given to the properties' and that [Defendant] was pressuring appraisers to inflate their valuations. . . .  And, [Plaintiff] has put forth a number of facts to support this allegation."  *Id.*

That New York standard was satisfied here.  The Complaint alleged substantial differences between the LTV/CLTV ratios represented by Defendants in their Offering Documents and those revealed by Plaintiffs' forensic pre-filing investigation (which the Magistrate Judge's Report found sufficient to allege the

---

[18] Judge Mariana R. Pfaelzer of the Central District of California is presiding over a Multi-District Litigation comprising fraud actions brought on RMBS issued by Countrywide Finance Corp. and its affiliates.  Judge Pfaelzer has developed a substantial body of case law governing these RMBS cases.  *See. e.g., AIG*, 943 F. Supp. 2d 1035; *Asset Mgmt. Fund v. Bank of America Corp.*, No. 12-CV-04775, 2013 WL 8116709 (C.D. Cal. Jan. 10, 2013); *FHFA v. Countrywide*, 932 F. Supp. 2d 1095; *Sealink Funding Ltd. v. Countrywide Fin. Corp.*, 860 F. Supp. 2d 1062 (C.D. Cal. 2012); *Bank Hapoalim v Bank of Am.*, 2012 WL 6814194;  *Thrivent Fin. for Lutherans v. Countrywide Fin. Corp.*, No. 11-CV-07154-MRP, 2012 WL 1799028 (C.D. Cal. Feb. 17, 2012); *Dexia Holdings, Inc. v. Countrywide Fin. Corp.,* No. 11-CV-07165-MRP, 2012 WL 1798997 (C.D. Cal. Feb. 17, 2012); *Allstate v. Countrywide*, 824 F. Supp. 2d 1164.

inaccuracy of the ratios as represented (A-847-49)) (A-36-44).  The Complaint

further alleged that the due diligence results provided by Clayton to Defendants on

a securitization-by-securitization basis during the period in which Securitizations

were issued (and summarized in the Clayton Report to the FCIC) disclosed that

23% (BOA) and 30% (Merrill), respectively, of the sampled loans from each

Defendant group's loan pools failed to conform to underwriting standards

including  LTV/CLTV (A-15-16, 49-50).  It alleged a systematic abandonment of

underwriting guidelines (*see supra* at 17-24) – specifically found by Judge Pfaelzer

to be a fact that supports an allegation that a defendant did not believe in the

LTV/CLTV ratios it included in its offering documents.  824 F. Supp. 2d at 1185.

The Complaint also alleged, as in *Allstate*, that at least one Defendant group

actively pressured originators to permit the misstatement of loan data, including

false appraisals, in order to make their loans seem to conform to underwriting

guidelines (A-61-63); *see* 824 F. Supp. 2d at 1185.  A finding that Plaintiffs have

failed to adequately allege a fraud claim for LTV/CLTV ratios here not only

disregards the Complaint's detailed allegations, but is irreconcilable with Judge

Pfaelzer's rulings in the MDL.

Indeed, the Complaint's allegations also satisfied the federal "believed to be

untrue by the speaker" standard applied below (*see* A-844-45), as they showed that

Defendants had actual knowledge that the originators' appraisals (and

34

consequently the LTV/CLTV data based on them) were inaccurate at the time they made the representations. *See, e.g., In re Bear Stearns Mortg. Pass-Through Litig.*, 851 F. Supp. 2d 746, 769-70 (S.D.N.Y. 2012) (upholding fraud claim under federal "opinion" standard when plaintiff alleged that Clayton had provided defendants with due diligence reports showing problems with LTV/CLTV appraisals). Contrary to *Bear Stearns* and other cases (*see* cases cited at 32 n.17, *supra*), the court below required Plaintiffs to identify what precisely was discovered in due diligence that informed Defendants that the represented LTV/CLTV ratios were wrong (as if the fact that Clayton reported massive deviations were not enough) (A-845-46). As legal support, the Magistrate Judge's Report relied principally on the *Landesbank Baden-Württemberg* case (*id.*), the inapplicability of which has been demonstrated (*supra* at 25-26). The prevailing weight of authority rejects the requirement imposed below (A-845-46) that the Clayton Report be "tied" to the particular securitizations being sued on (*supra* at 19-20, 26-27).[19]

---

[19] In *Tsereteli*, 692 F. Supp. 2d at 393-94 (A-844), the District Court dismissed LTV claims because the Plaintiffs failed to allege facts showing that the appraisals upon which the LTV representations were based were inaccurate. As the Magistrate Judge's Report acknowledged (A-847-49), Plaintiffs' loan-level investigation provided such allegations here. As for *DZ Bank*, 2013 WL 6667601, at *17-18, also cited in the Magistrate Judge's Report (A-845, 846-47), *see supra* at 26-27 n.14.

35

### C.    <u>Owner-Occupancy Rates</u>

#### 1.    <u>Falsity</u>

The Complaint contained extensive allegations showing the falsity of the owner-occupancy rates represented in the Offering Documents (A-46-49).  The court below did not question the sufficiency of those allegations.

#### 2.    <u>Scienter</u>

The court below nevertheless dismissed Plaintiffs' fraud claims based on misrepresentation of owner-occupancy rates, essentially on grounds of scienter. The court below ruled there was no fraudulent mispresentation because the Offering Documents disclosed that the owner-occupancy representations were based on information provided by borrowers, and the Complaint did not allege that Defendants misrepresented the information the borrowers provided (A-850-52) (citing *Union Central v. Credit Suisse,* 2013 WL 1342529, at *9 (Daniels, D.J.)). This ruling was erroneous.[20]

---

[20] A large number of cases have sustained claims of fraud relating to owner-occupancy rates at the pleading stage, based on allegations similar to, or less detailed than, Plaintiffs' here.  *See DZ v. Credit Suisse*, at 29:7-30:18; *DZ v. RBS*, at 23:16-24:14 (SPA-58-59); *DZ v. Goldman Sachs*, at 52:9-53:6 (SPA-115-16); *DZ v. UBS*, 2014 WL 1495632, at *1; *IKB v. Credit Suisse*, 2014 WL 859355, at *7; *HSH v. Barclays*, 2014 WL 841289, at *15-19; *HSH v. Goldman Sachs*, 2013 WL 84776977, at *5; *AMF v. Morgan Stanley*, at 52:19-53:11, 69-71 (SPA-177-78, 194-96); *but see LBBW v. RBS*, 2014 WL 1388408, at *14; *DZ v. HSBC*, 2013 WL 6667601, at *19-21; *Bank Hapoalim*, 2012 WL 6814194, at *8; *see also, e.g.*, *Dexia v. Bear, Stearns*, 929 F. Supp. 2d at 239-42; *Prudential v. Credit Suisse*, 2013 WL 5467093, at *11-12, *17; *Prudential v. Goldman Sachs*, 2013 WL

36

Read fairly, the Complaint here – unlike the complaint described by Judge Daniels in the *Union Central* case cited in the Magistrate Judge's Report – ***did*** allege that Defendants knowingly misrepresented owner-occupancy rates. The Complaint alleged that owner-occupancy rates was one of the metrics Clayton reviewed as part of its due diligence for Defendants (A-49) and reported to Defendants as one where underwriting guidelines rates were systematically abandoned (A-49-50). The mere disclaimer that information was provided by borrowers cannot shield Defendants from liability if they knew such information was false.

The Magistrate Judge's Report criticized Plaintiffs for failing to identify the materials reviewed by Clayton that showed the widespread deviation from owner-occupancy guidelines (A-851).[21] However, it is not the identity of specific documents that Clayton looked at that matters at this point, but the fact that Clayton reported to a governmental investigative commission that it provided

---

1431680, at *7; *Allstate v. Credit Suisse*, 2014 WL 432458, at *11-13; *Allstate v. Merrill Lynch*, 2013 WL 4046711, at *11-13; *but see also, e.g.*, *FHFA v. Merrill Lynch & Co.*, 903 F. Supp. 2d at 278; *FHFA v. Morgan Stanley*, No. 11 Civ. 6739, 2012 WL 5868300, at *2 (S.D.N.Y. Nov. 19, 2012); *Mass. Mut. Life Ins. Co. v. Countrywide Fin. Corp.*, No. 11 Civ. 10414, 2012 WL 3578666, at *2 (C.D. Cal. Aug. 17, 2012); *Mass. Mut. Life Ins. Co. v. Residential Funding Co., LLC*, 843 F. Supp. 2d 191, 204-05 (D. Mass. 2012); *Stichting*, 2012 WL 6929336, at *9 n.4.

[21] The Magistrate Judge's Report made the assumption "that the loan files, ***presumably,*** close once the loan is made" (A-851) (emphasis added), such that changes in occupancy status between the making of the loan and the closing of the Securitization would not be reflected therein. That factual determination has no basis in the record.

Defendants with due diligence findings of deviations from underwriting guidelines including owner-occupancy.  Coupled with Plaintiffs' own pre-suit forensic investigation into the specific loans pooled in the Securitizations at issue in this case that showed great disparities between reported and actual owner-occupancy rates around the time of the issuance of each Securitization (A-46-49), Plaintiffs' unrebutted factual allegations were sufficient at the pleading stage to show that Defendants knew of the inaccuracy of their owner-occupancy representations when they issued the Securitizations.[22]

## D.  "Mortgage-Backed" Securities

### 1.  Falsity

The most basic and significant characteristic of a mortgage-backed security is that it actually is backed by mortgages.[23]  The Magistrate Judge's Report

---

[22] The Magistrate Judge's Report distinguished two cases sustaining owner-occupancy claims as arising under Section 11 of the Securities Act of 1933 rather than a fraud provision (A-853).  In fact, however, many cases have sustained *fraud* claims relating to owner-occupancy at the pleading stage based on allegations similar to Plaintiffs'.  *See supra* at 36 n.20.

[23] Mortgage loans are debt obligations evidenced by notes, secured by mortgages.  *See, e.g., Carpenter v. Longan*, 83 U.S. 271, 274 (1872) (assignment of mortgage without transfer of loan a "nullity"); *Merritt v. Bartholick,* 36 N.Y. 44, 45 (1867) (assignment of mortgage without assignment of underlying note a nullity). The notes are subject to Article 3 of the Uniform Commercial Code.  *See, e.g., Slutsky v. Blooming Grove Inn, Inc.*, 542 N.Y.S.2d 721, 723 (2d Dep't 1989) ("The note secured by the mortgage is a negotiable instrument ...."); *U.S. Bank, N.A. v. Bennett*, No. 11 MA 40, 2012 WL 2254189, at *3 (Ohio Ct. App. 7th Dist. June 12, 2012) ("[A] note secured by a mortgage is widely considered to be a

correctly acknowledged that Plaintiffs sufficiently pled facts inferring that this

crucial requirement was not met here:  that mortgage loans were not, in fact, timely

transferred to the Trusts whose Certificates were falsely sold to Plaintiffs as

---

negotiable instrument."); *Leyva v. Nat'l Default Servicing Corp.*, 255 P.3d 1275, 1279 (Nev. 2011).

Normally, notes governed by Article 3 are transferred by negotiation:  *i.e.*, they must be indorsed (either to a specific transferee or in blank) and then delivered to the transferee.  N.Y. U.C.C. § 3-202; *See, e.g., 5-Star Mgmt., Inc. v. Rogers*, 940 F. Supp. 512, 522 (E.D.N.Y. 1996) (delivery of the note must generally accompany a mortgage and note assignment); *Nat'l Bank of N. Am. v. Flushing Nat'l Bank*, 421 N.Y.S.2d 65, 66 (1st Dep't 1979) ("Without an indorsement, a transferee cannot be a holder"); *see Fremont Inv. and Loan v. Gramse, et al.*, No 08-19019, slip op. at 2 (Sup. Ct. Suffolk Cnty. Feb. 27, 2009) (SPA-220) ("Absent an effective transfer of the note, the assignment of the mortgage . . . would be a nullity.").  Following the requirements of the UCC, the PSAs here were represented to require that the transfer of the mortgage loans be effectuated by means of indorsement and delivery of the notes (A-76-77).  Moreover, New York trust law requires strict compliance with the provisions of the document forming a trust – here, the Pooling and Servicing Agreements by which the Trusts were formed ("PSAs") – regarding transfer of assets into the trust, in order for the trust to be formed in the first place.  For that reason, courts have required strict compliance with PSA provisions requiring indorsement and delivery of mortgage notes to RMBS trusts.  *See Glaski v. Bank of Am., N.A.*, 160 Cal. Rptr. 3d 449, 462-65 (Cal. Ct. App. 2013) (transfer not in strict compliance with requirements of PSA is void *ab initio* under New York trust law); *In re Saldivar*, Bankr. No. 11-10698, 2013 WL 2452699, at *2, 4-5 (Bankr. S.D. Tex. June 5, 2013) (same); *Wells Fargo Bank v. Erobobo*, 972 N.Y.S.2d 1147, 2013 WL 1831799, at *8 (Sup. Ct. Kings Ctny. 2013) (same); *Hendricks v. U.S. Bank N.A.*, No. 10-849-CH, slip op. at *6-7 (Mich. Trial Ct. Washtenaw Cnty. June 6, 2011) (same) (A-645-52); *Horace v. LaSalle Bank, N.A.*, No. 57-CV-2008-000362.00, slip op. (Cir. Ct. Russel Cnty. Ala. Mar. 25, 2011) (A-641-44) (permanently enjoining a trust from foreclosing because a mortgage loan note is not transferred to an RMBS trust if the method of transfer differs from the PSA's terms).

"mortgage-backed" (A-855-57).[24]  The court below nevertheless found that

Plaintiffs failed to state a fraud claim based on their having been sold so-called

"mortgage-backed" securities that were not in fact backed by mortgages (A-857-

60).  This erroneous ruling runs contrary to the substantial case law sustaining such

claims at the pleading stage.[25]

---

[24] Indorsement and delivery of the hundreds of thousands of mortgage notes underlying each Securitization, as required by the UCC for valid transfer, would have been a costly and time-consuming proposition.  So Defendants made it a practice not to do it – even though the Offering Documents specifically represented that indorsement and delivery of the notes were to be effectuated.  Thus, Plaintiffs' pre-suit investigation found numerous documents in local court files showing that mortgages had not been transferred – in many cases specifically stating that notes had not been delivered – either ever, or not until years after the closing of the Trusts (A-77-80, 116-87, 107-15).  Timely transfer is crucial:  if the mortgage loans are not transferred to the Trusts within three months of closing, the Trusts risk losing favorable federal income tax treatment as Real Estate Mortgage Investment Conduits, necessary to the economic viability of the investments.  *See* Bradley T. Borden & David Reiss, *Wall Street Rules Applied to REMIC Classification*, Thompson Reuters News and Insight (Sept. 13, 2012), available at http://newsandinsight.thomsonreuters.com/Legal/Insight/2012/09_-_September/Wall_Street_Rules_Applied_to_REMIC_Classification/; *Saldivar*, 2013 WL 2452699, at *2 (Bankr. S.D. Tex. June 5, 2013) (late transfer of mortgage loan to RMBS trust endangers REMIC status); *Erobobo*, 2013 WL 1831799, at *8-9 (same); *Glaski*, 160 Cal. Rptr. 3d at 462-65 (requirement of strict compliance with the PSA provisions governing loan transfers "protects the beneficiaries of the []Securitized Trust [*i.e.*, RMBS investors] from the potential adverse tax consequence of the trust losing its status as a REMIC trust under the Internal Revenue Code.").

[25] *See Prudential v. Credit Suisse*, 2013 WL 5467093, at * 13-14, 17; *Prudential v. Goldman Sachs*, 2013 WL 1431680 at *7;  *AMF v. Morgan Stanley*, at 52:19-53:11, 69-71 (SPA-177-78, 194-96); *Cambridge Place Inv. Mgmt. Inc. v. Morgan Stanley & Co*., No. 10-2741-BLS1, 2012 WL 5351233 (Mass. Super. Suffolk Cnty. Sept. 28, 2012); *Federal Home Loan Bank of Chicago v. Banc of*

The court below first reasoned that Plaintiffs merely alleged a breach of contract rather than a fraud, because the transfer of mortgage loans to the Trusts is so central to the parties' bargain that a failure to do so can only be characterized as a breach of the purchase contract for the Certificates (A-858-60).  Not only does this finding turn the law on its head, but it is based on a false premise.

The Magistrate Judge's Report referred to a number of alleged misrepresentations in the Offering Documents to the effect that the mortgage loans were to be transferred to the Trusts at or about the time of closing (A-853-55).  Since the time of closing was antecedent to the time the representations were made, the Magistrate Judge's Report treated these representations as relating to future acts (A-857-59).  In so doing, however, the Report gave short shrift to the Complaint's allegations of numerous representations ***made in the present tense*** in the Offering Documents that the Certificates were "mortgage pass-through securities" or that they were "mortgage-backed" (A-76).  The Complaint also alleged such ***present-tense*** representations in the Offering Documents as, "[t]he

---

*Am. Funding Corp*., No. 10 CH 45033, 2012 WL 4364410 (Ill. Cir. Ct. Cook Cnty. Sept. 19, 2012); *Western & S. Life Ins. Co. v. Residential Funding Co*., No. A1105042, 2012 Ohio Misc. LEXIS 100 (Ohio Ct. Com. Pl. June 6, 2012); *Western & S. Life Ins. v. DLJ Mortg. Capital Inc*., No. A1105352, slip op. (Ohio Ct. Com. Pl. May 22, 2012) (SPA-222-25); *but see, e.g., DZ v. HSBC,* 2013 WL 6667601, at \*16-18; *Asset Mgmt. Fund v. Bank of America,* 2013 WL 8116709, at \*4; *Bank Hapoalim,* 2012 WL 6814194, at \*8; *Dexia v. Countrywide,* 2012 WL 1798997, at \*5; *Thrivent,* 2012 WL 1799028, at \*5; *IKB v. Credit Suisse,* 2014 WL 859355, at 7; *HSH v. Barclays*, 2014 WL 841289, at \*9-16; *HSH v. Goldman Sachs,* 2013 WL 8476977, at \*6-7.

41

certificates represent ownership interests in a trust consisting primarily of a pool of first and second lien residential mortgage loans" (*id.*).  While the Offering Documents described the process by which the mortgage loans were to be transferred to the Trusts – *i.e.,* delivery to the Trustee or its custodian of indorsed mortgage notes ***at or about the time the Certificates were issued and the investment transactions thus completed*** – those acts were not antecedent to the completion of the investment transaction, but contemporaneous with it (A-76-77; *see* A-854-55).  As other courts have held, these are not allegations of acts to take place in the future, but rather of statements of contemporaneous fact.:

> The Certificates were marketed as mortgage backed and the representations referred to present circumstances.  When construed in favor of Plaintiffs, the allegations support an inference that the statements were false when made.

*Western & Southern v. Residential Funding*, 2012 Ohio Misc. LEXIS 100, at *25; *accord, e.g., Cambridge Place*, 2012 WL 5351233, at *20.

The court below further concluded that the representations that the Certificates were "mortgage-backed" could not support fraud claims because they were not "collateral or extraneous" to the "contract," but rather central to it (A-859).  Plaintiffs do not dispute the centrality to their investment of the representation that the Certificates were "mortgage-backed."  But it was curious for the court below to rule that this misrepresentation does not sound in fraud because of its very materiality.

42

In any event, the obligation to transfer mortgage loans to the Trusts *is* "extraneous" to the only contracts Plaintiffs were parties to: their contracts for the purchase of the Certificates. Plaintiffs were not parties to the PSAs that governed the transmission of mortgage loans to the Trusts (*see* A-75); rather, certain of the Defendants were (*see* A-18, 75). Compliance with the terms of the PSAs by the parties to those contracts was extraneous to Plaintiffs' separate contracts for the purchase of Certificates. When Defendants falsely represented to Plaintiffs that they were complying with the mortgage loan transfer terms of the PSAs (while knowing they were not), they committed fraud on the Plaintiffs – not a breach of contract. *See Prudential,* 2013 WL 5467093, at *14 (investors had fraud claim for failure to transfer mortgage loans to RMBS trusts because they "were not a party" to the PSAs).

### 2.   Scienter

In the alternative, the court below concluded that, even if a fraud claim could lie for a misrepresentation of a core characteristic of a security, Plaintiffs still failed to state a fraud claim here because they failed to allege Defendants' intent not to transfer loans to the Trusts at the time the Offering Documents were issued (A-860). That conclusion disregarded the allegations of the Complaint that Plaintiffs had conducted a separate pre-suit investigation of RMBS issued and underwritten by Defendants during the year prior to the date of issuance of the first

43

Securitization sued on here, and that investigation disclosed the same failure to transfer mortgage loans to those trusts (A-81-82).   By the time Defendants issued the Offering Documents for the Certificates at issue here, Defendants had already established a pattern and practice of saving themselves the immense effort and expense of indorsing hundreds of thousands of mortgage notes by failing to effectuate the transfer of mortgage loans to RMBS trusts, and thus knew they were going to continue that failure with these securities.   Moreover, with each successive Certificate Plaintiffs purchased over a period of more than a year, Defendants had more and more knowledge of prior failures to transfer.   *See Federal Home Loan Bank of Chicago*, 2012 WL 4364410 (no internal pagination) (sustaining title transfer claims where plaintiff alleged that the "failure to validly assign and transfer mortgages and mortgage notes was 'systematic in the industry' and occurred often enough to 'materially impair'" RMBS' value).

### E.   Scienter Generally

Since the court below put its scienter analysis in its discussion of falsity, the express rationale for dismissal on the stated ground of scienter was only that "[t]he Complaint does not identify any specific information that came to [D]efendants' attention and that put [D]efendants on notice that the third-party statement[s] they were re-transmitting were false" (A-876).   This ruling was erroneous for the reasons stated above in connection with Defendants' knowledge of the falsity of

their representations in the Offering Documents relating to adherence to underwriting guidelines, LTV/CLTV, owner-occupancy, and mortgage loan transfer.

Not only does the Complaint allege that Defendants were apprised of the falsity of the metrics they misrepresented by their due diligence service provider (A-49-52), but also that Defendants had special access to the underwriting information of many originators through warehouse lending arrangements (A-53-54, 56-58), and that Merrill Lynch actually had ownership interests in two of the worst mortgage originators (Ownit and First Franklin) (A-58-61) and used its ownership clout, as well as its status as a warehouse lender, to actively pressure originators into deviating from their underwriting guidelines (A-61-63).  Indeed, high-level executives of at least one Defendant group have admitted to knowing of fraud in the origination of mortgage loans included in RMBS pools (A-62-63).  *See e.g., Dexia v. Bear, Stearns,* 929 F. Supp. 2d at 241-42 (substantially similar allegations "support a strong inference that the defendants knew that the mortgages included within the loan pools were not of the quality represented in the offering documents"); *Prudential v. Credit Suisse*, 2013 WL 5467093 at *17 (same; and, because the "Defendants were responsible for several steps in the securitization process, which necessitated the proper transfer of title . . . .[,] plaintiffs have [also]

plausibly alleged that the alleged title-transfer misrepresentations in the offering materials were made knowingly.").[26]

**F.    Reasonable Reliance**

The court below concluded that Plaintiffs adequately alleged sufficient diligence prior to the purchases of the Certificates to render their reliance on Defendants' misrepresentations reasonable (A-878-79).  It erroneously ruled, however, that no reliance could be found because IKB purportedly purchased the Certificates prior to the issuance of the final Prospectus Supplements (A-876-78).

The Complaint alleged that Plaintiffs received a number of Offering Documents from Defendants, including preliminary sales documents, prior to

---

[26] *See also, e.g.*, *LBBW v. RBS*, 2014 WL 1388408, at *12-13 (substantially similar allegations, including those concerning the Clayton Report and warehouse lending arrangements, "raise a strong inference that Defendants either knew or were reckless in not knowing that their Offering Materials falsely stated that the loans comprising the securitizations at issue met originators' underwriting guidelines"); *JPMorgan Chase & Co.*, 902 F. Supp. 2d at 493 ("It can hardly be disputed that, taken together, ...  allegations  …  [analogous to those here] adequately plead that [Defendants] acted with fraudulent intent in misrepresenting the underwriting standards that governed the Supporting Loans."); *FHFA v. Merrill Lynch & Co.*, 903 F. Supp. 2d at 277-78 (same); *Prudential v. Bank of Am.*, 2014 WL 1515558 at *13-15 (While "[t]he Clayton allegations provide a nearly sufficient factual foundation on their own" to support a fraud claim based on the abandonment of underwriting guidelines, the totality of the allegations "are sufficient to raise a strong inference of the requisite fraudulent intent."); *Prudential v. Goldman Sachs*, 2013 WL 1431680 at *7 (allegations established an inference of scienter with respect to misstatements concerning, *inter alia*, mortgage transfer, adherence to underwriting guidelines, LTV/CLTV/appraisals, and owner-occupancy); *Bank Hapoalim*, 2012 WL 6814194 at *9 (allegations established an inference of scienter with respect to misstatements concerning adherence to underwriting guidelines and  LTV/CLTV).

46

submitting purchase orders for the Certificates, and that such documents, and the information they contained, were the basis for IKB's decision to submit such purchase orders (A-14, 86-87).  The Complaint also alleged that Plaintiffs received the final Prospectus Supplements (*id.*).  While the Prospectus Supplements were allegedly received **after** the "trade dates" on which IKB submitted purchase orders for the Certificates, they were all received **before** the settlement or "issue dates" set forth for each Securitization in the Complaint (*see* A-25-26).  This distinction is crucial.

As is well established, the trade date is merely that on which an order is placed – but the actual purchase, and therefore the point at which reliance attaches, does not occur until the settlement date.  *See In re Adler, Coleman Clearing Corp.*, 247 B.R. 51, 77 n.33 (Bankr. S.D.N.Y. 1999), *aff'd* 263 B.R. 406 (S.D.N.Y. 2001) ("Claimants assert that a securities contract is formed on trade rather than settlement date. We disagree."); *see also Abu Dhabi Commercial Bank v. Morgan Stanley & Co., Inc.*, 888 F. Supp. 2d 431, 463 n.196, 465 n.208 (S.D.N.Y. 2012) (rejecting argument that investors in notes backed by RMBS could not rely on ratings generated after the trade dates, finding that defendants had not established that the plaintiffs had entered into a binding agreement prior to receiving the finalized ratings), *on reconsideration in part,* 888 F. Supp. 2d 478 (S.D.N.Y. 2012).

By the logic of the court below, the Defendants could have distributed preliminary Offering Documents with wildly overstated numeric data, and then changed the data to the real data in the final Prospectus Supplement, and investors who had already submitted purchase orders based on the false preliminary documents would have been unable to withdraw.  Because the transactions were not completed until the settlement dates – *after* the issuance of the final Prospectus Supplements – that illogical result is not the case.  *Abu Dhabi*, 888 F. Supp. 2d at 463-65 & nn.196 & 208 (holding that the trier of fact could infer that the plaintiffs' relied on allegedly false and misleading credit ratings in preliminary offering materials because the plaintiffs' decision to invest was revocable until the final ratings were issued); *see also Allstate Ins. Co. v. Ace Sec. Corp*, No. 650431/2011, 2013 WL 1103159, at *14 (Sup. Ct. N.Y. Cnty. Mar. 14, 2013) (rejecting the argument that "plaintiffs cannot claim that they reasonably relied on the representations in the prospectus supplements because the offerings were purchased before the supplements were issued" when "the complaint defines the 'Offering Materials' as including 'drafts,' term sheets and other non-final documents, not merely prospectus supplements.").

48

## POINT  II

## PLAINTIFFS ADEQUATELY PLED
## NEGLIGENT MISREPRESENTATION AND
## FRAUDULENT CONCEALMENT CLAIMS

The court below dismissed Plaintiffs' claims for negligent misrepresentation and fraudulent concealment for lack of allegations showing a fiduciary relationship between Plaintiffs and Defendants, as usually required for such claims (A-881-84). That ruling was erroneous.

The District Court disregarded the well-established exception to the general rule where, as here, one party to the transaction has special knowledge not obtainable by the other party. *See CSI Inv. Partners II, L.P. v. Cendant Corp.*, No. 600797/2000, 2001 WL 36412703 (N.Y. Sup. Ct. N.Y. Cnty. July 27, 2001) ("[E]ven in arm's-length negotiation, a party with sole knowledge of material information which is unobtainable by the other party, has a duty to disclose such information where the 'superior knowledge of essential facts renders a transaction without disclosure inherently unfair.'"); *Kimmell v. Schaefer*, 652 N.Y.S.2d 715, 719 (N.Y. 1996) (duty to speak with care exists in commercial context when "the relationship of the parties . . . [is] such that in morals and in good conscience the one has the right to rely on the other for information").

As RMBS issuers and underwriters, Defendants had sole knowledge of material information which was unobtainable by investors, because Defendants

49

had exclusive access to the loan files.[27]  As a result, Plaintiffs' claims are sufficient to survive a motion to dismiss.  *See Abu Dhabi Commercial Bank v. Morgan Stanley & Co., Inc.*, 910 F. Supp. 2d 543, 547 (S.D.N.Y. 2012) (holding that as to mortgage-backed securities, "because Morgan Stanley allegedly had superior non-public information upon which it knew plaintiffs would rely, Morgan Stanley can be liable for negligent misrepresentation."); *Dexia v. Bear, Stearns*, 929 F. Supp. 2d at 245 ("[T]he question of the nature of the relationship between defendants and [the initial RMBS investor] raises a question of fact that is better reserved for determination after discovery into this relationship.").[28]

## POINT  III

### PLAINTIFFS ADEQUATELY PLED
### AN AIDING AND ABETTING CLAIM

The court below premised its dismissal of Plaintiffs' aiding and abetting claims soley on its conclusion that Plaintiffs had not pleaded any primary fraud

---

[27] Nor do such loan files merely constitute Defendants' knowledge of their own business.  Rather, the loan files contain crucial data concerning the assets that were the ***subject of the transaction itself***, namely, the collateral of the Certificates.

[28] *But see, e.g., Dexia v. Deutsche Bank*, 2013 WL 98063, at *4-7 (dismissing negligent misrepresentation claims); *Bank Hapaolim*, 2012 WL 6814194, at *9-10; *Allstate v. Credit Suisse*, 2014 WL 432458.

claims (A-884-85).   That ruling is erroneous.  Once Plaintiffs' primary fraud

claims are sustained, so too should their aiding and abetting claim.[29]

---

[29] Although actual knowledge of the fraud must be alleged, Rule 9(b) permits it to be alleged generally.  *S.E.C. v. Berry*, 580 F. Supp. 2d 911, 923 (N.D. Cal. 2008) ("the plain text of Rule 9(b) requires only a general allegation of 'knowledge, and other conditions of a person's mind'").  Such allegations "must give rise to the strong inference of actual knowledge of the fraud."  *Flycell, Inc. v. Schlossberg LLC*, No. 11 Civ. 0915 CM, 2011 WL 5130159, at *10 (S.D.N.Y. Oct. 28, 2011).  The Complaint alleged that the Controlling Parent Defendants and Underwriter Defendant had actual knowledge of the Issuer Defendants' fraud (A-17, A-33-36).  These allegations were well-supported by the fact that the Defendants shared officers, directors, executives and high-level employees (*id.* Tables 2 & 3 at A-30).  The Controlling Parent Defendants and Underwriter Defendant shared those other Defendants' knowledge as well.  *See Stichting*, 2012 WL 6929336, at *12; *UBS Sec. LLC v. Highland Capital Management L.P.*, 924 N.Y.S.2d 312 (Sup. Ct. N.Y. Cnty. 2011), *aff'd in part, mod. in part*, 940 N.Y.S.2d 74 (1st Dep't 2012).  Substantial assistance exists where defendants "affirmatively assist[ed], help[ed] conceal, or by virtue of failing to act when required to do so enable[d] the [underlying harm] to proceed."  *OSRecovery, Inc. v. One Groupe Int'l, Inc.*, 354 F. Supp. 2d 357, 378 (S.D.N.Y. 2005).  Here, substantial assistance was adequately pled with respect to each of the Controlling Parent Defendants and Underwriter Defendant.  Plaintiffs separately identified the acts constituting substantial assistance and alleged that each Defendant knew about and substantially assisted the fraud.  For example, the Complaint alleged that the Underwriter Defendant played an essential role in the Issuer Defendants' fraud because the Underwriter Defendant:  (1) participated in the structuring and marketing of the Securitizations, which was an essential component of the sale of the Certificates to Plaintiffs; (2) conducted its own due diligence; (3) permitted the Issuer Defendants to buy non-conforming loans and include them in the Securitizations so that it could earn higher fees; (4) assisted in the preparation of the Offering Documents, including by providing information contained therein that it knew to be false; and (5) provided the Offering Documents to Plaintiffs to solicit their investments (A-17, A-34-36).  The Underwriter Defendant received substantial fees for its work relating to the Securitizations (*id.*).  As a result, the Underwriter Defendant had full knowledge of the misrepresentations and directly assisted in making the misrepresentations contained in the Offering Documents.  In addition, the Controlling Parent Defendants directly or indirectly owned and

## <u>CONCLUSION</u>

For the foregoing reasons, Plaintiffs-Appellants respectfully request that the

Order and Judgment of the District Court dismissing their Complaint be reversed.

Dated:        New York, New York
              July 2, 2014

              LABATON SUCHAROW LLP

              */s/ Mark S. Arisohn*
              Joel H. Bernstein (jbernstein@labaton.com)
              Mark S. Arisohn (marisohn@labaton.com)
              Barry Michael Okun (bokun@labaton.com)
              140 Broadway
              New York, NY 10005
              Telephone:   (212) 907-0700
              Facsimile:   (212) 818-0477

              *Attorneys for Plaintiffs-Appellants*

---

controlled the other Defendants and directed and profited from the other
Defendants' fraud (A-17, A-33).

## <u>CERTIFICATE OF COMPLIANCE</u>

This brief complies with the type-volume limitation of Rule 32(a)(7)(B) of the Federal Rules of Appellate Procedure because it contains 13,154 words, excluding the parts of the brief exempted by Rule 32(a)(7)(B)(iii).

This brief complies with the typeface requirements of Rule 32(a)(5) and the type style requirements of Rule 32(a)(6) because it has been prepared in a proportionally spaced typeface using Microsoft Office 2010 in Times Roman 14-point font.

Dated: July 2, 2014                    Respectfully submitted,

/s/Mark S. Arisohn
Joel H. Bernstein
Mark S. Arisohn
Barry Michael Okun
LABATON SUCHAROW LLP
140 Broadway
New York, New York   10005
Tel.: (212) 907-0700
Fax: (212) 818-0477

*Attorneys for Plaintiff-Appellants*